## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                     Cr. No. 06-538 JCH

DANUEL DEAN QUAINTANCE, and
MARY HELEN QUAINTANCE,

        Defendants.

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendants Danuel Dean Quaintance and Mary Helen Quaintance's Motion for Suppression of Evidence and Incorporated Memorandum, dated April 18, 2006 **[Doc. No. 39]**. On May 17, 2006, the Court held an evidentiary hearing on the motion to suppress. Defendant Danuel Dean Quaintance was present at the hearing and was represented by Marc Robert, Esq. Defendant Mary Helen Quaintance was present at the hearing and was represented by Mario Esparza, Esq. The United States was present and represented by Assistant United States Attorney Luis Martinez. After considering the evidence presented at the hearing, along with the arguments of counsel, written briefs, and applicable law, the Court concludes that the motion is not well taken and should be denied.

### FINDINGS OF FACT

Based upon the evidence presented at the hearing, the Court makes the following findings of fact.

On February 22, 2006, at approximately 1:30 p.m., Senior Border Patrol Agent Bernado

Ramirez III was fueling his patrol vehicle at the Diamond Shamrock gas station in Lordsburg, New Mexico.  Agent Ramirez observed a grey Chrysler 300 parked next to the Diamond Shamrock, and a green minivan parked in the drive through area of the Kentucky Fried Chicken next to the Diamond Shamrock.  These vehicles were occupied by Defendants Danuel and Mary Quaintance ("Quaintance Defendants"), who were traveling through Lordsburg with co-Defendant Timothy Jason Kripner.  The Quaintance Defendants were driving the green minivan and co-Defendant Kripner was driving the Chrysler 300.

Agent Ramirez observed the minivan's passenger, Defendant Danuel Quaintance, exit the vehicle and walk into the Diamond Shamrock.  Shortly thereafter, the minivan driven by Defendant Mary Quaintance proceeded through the Kentucky Fried Chicken drive through and parked in the Diamond Shamrock's parking lot.  Co-Defendant Kripner drove and parked the Chrysler next to the minivan.  Co-Defendant Kripner exited the Chrysler and began speaking with Defendant Mary Quaintance, who remained in the minivan.  Co-Defendant Kripner then removed two large bags of Kentucky Fried Chicken food from the minivan and placed the bags on the front floorboard of the Chrysler.  Thereafter, Defendant Danuel Quaintance exited the Diamond Shamrock with two large see-through plastic bags of food, which he also placed on the front floorboard of the Chrysler.  Agent Ramirez testified that individuals meeting guides who smuggle aliens or narcotics across the border often purchase large quantities of food for the guides' consumption on their trips back to Mexico.  The Court finds Agent Ramirez's testimony in this regard credible.  U.S. Border Patrol Agent Jose Portillo also testified that individuals carry large quantities of food for those smuggling illegal narcotics or aliens into the country.  The Court likewise finds Agent Portillo's testimony credible.

2

The Quaintance Defendants, driving the minivan, exited the Diamond Shamrock followed by co-Defendant Kripner, who was driving the Chrysler.  Agent Ramirez also was leaving the Diamond Shamrock, and he followed the Defendants onto Interstate 10 traveling east.  After traveling approximately ten miles, Defendants exited Interstate 10 at mile marker 34 onto New Mexico Highway 113 south.  Agent Ramirez followed Defendants off of Interstate 10.

Agents Ramirez and Portillo testified that Highway 113 is a notorious route for alien and narcotic smugglers.  Agents Ramirez and Portillo also testified that Highway 113 is used by individuals living locally.  The Court finds Agent Ramirez's and Portillo's undisputed testimony regarding the notorious nature of Highway 113 and the fact that Highway 113 is used primarily by locals credible.  Agent Ramirez further testified that he had noticed that the minivan had an Arizona license plate and that the Chrysler had a temporary license plate.  Agent Ramirez found it suspicious that the Defendants, who did not appear to live locally, had exited on Highway 113.

Near mile marker seven on Highway 113, railway tracks cross the Highway.  Just north of the railroad crossing are two hills, and between the crossing and the hills are gates on each side of the Highway.  Agent Ramirez testified that this portion of Highway 113 is particularly well known as being notorious for drug and alien smuggling because the hills provide cover and the gates can be used as markers for the drop-off and pick-up of illegal aliens or narcotics.  The Court finds Agent Ramirez's testimony in this regard credible.

After exiting the interstate, Agent Ramirez parked his vehicle at an abandoned gas station located near the intersection of Interstate 10 and Highway 113, at approximately mile marker nineteen.  Agent Ramirez, using binoculars, continued to observe the green minivan, followed by the grey Chrysler, traveling south on Highway 113.  Agent Ramirez watched the vehicles

traveling south on Highway 113 through his binoculars for approximately five miles. Agent Ramirez then informed law enforcement of his observations and attempted to locate an agent near his geographic area. Agent Portillo responded, and Agent Ramirez informed him of his observations.

Agent Ramirez began driving south on Highway 113 when he lost visual of the vehicles at approximately mile marker fourteen. At certain points, when the road curved, he was again able to see the vehicles. Agent Ramirez then lost visual of the vehicles for three to four minutes. As Agent Ramirez approached mile marker seven, he observed the vehicles passing him and traveling northbound, still in tandem with the green minivan leading the Chrysler, on Highway 113. Agent Ramirez knew that the vehicles would not have had time to reach town or any other usual destination during the three to four minutes he did not see them. Agent Ramirez's suspicions were further heightened because it was unusual for cars to travel south for several miles on Highway 113 to no specific destination, and then, to simply turn around and travel north again. Agent Portillo's suspicions were raised for the same reason.

Agent Ramirez then turned around and began following the vehicles north. Agent Portillo drove to the intersection of Interstate 10 and Highway 113, and observed two vehicles heading north towards him. Agent Portillo drove south on Highway 113 towards the vehicles to confirm that they were the vehicles described by Agent Ramirez. At approximately mile marker fifteen, Agent Portillo confirmed the identity of the vehicles. Agent Portillo informed Agent Ramirez that he was going to conduct an immigration inspection of the Chrysler and that he was going to have another agent conduct an inspection of the minivan.

Agent Portillo pulled in behind the Chrysler and noticed that co-Defendant Kripner

4

swerved the Chrysler onto the shoulder of the highway.  In addition to knowing that Highway 113

is a notorious smuggling route, that the vehicles had traveled south for a short period of time and

then turned around and drove north, and that the Defendants had purchased large quantities of

food, Agent Portillo's suspicions were further raised because the two vehicles were traveling in

tandem.  Agent Portillo testified that based upon his experience, the first vehicle acts as the "heat"

vehicle.  If law enforcement becomes suspicious, the first vehicle tries to attract attention away

from the following vehicle, thereby allowing the following vehicle to slip by law enforcement

undetected.  Agent Portillo also became more suspicious because the Chrysler had temporary

tags.  Agent Portillo testified that he has seen a pattern of rental vehicles being used to transport

narcotics.  He therefore proceeded to run the tag, which came back as a dealer plate.  As Agent

Portillo's vehicle came closer to the Chrysler, Agent Portillo noticed that co-Defendant Kripner

got "real nervous."  Agent Portillo also noticed dusty handprints on the vehicle's trunk.  Based

upon the foregoing, Agent Portillo concluded that a smuggling scheme was afoot.

Agent Portillo radioed U.S. Border Patrol Agent Jackson Lara, who at this time had

positioned his patrol unit at the intersection of Interstate 10 and Highway 113, of the situation and

advised that he was going to conduct an immigration inspection of the Chrysler.  Agent Portillo

requested that Agent Lara conduct an immigration inspection of the green minivan, which was

leading the Chrysler north on Highway 113.  Agent Portillo then activated his emergency

equipment and the Chrysler came to a stop on Highway 113, near mile marker seventeen.  As

Agent Portillo approached the vehicle, he observed a bundle covered by a black shirt behind the

passenger seat.  This bundle was consistent in appearance to other bundles containing narcotics.

When co-Defendant Kripner rolled his window down, Agent Portillo detected the odor of

marijuana emitting from inside of the vehicle.

Soon thereafter, Agent Lara stopped the green minivan near mile marker nineteen. Defendant Mary Quaintance was the driver and Defendant Danuel Quaintance was the sole passenger. At some point during the first five minutes that he was on the scene, Agent Lara became aware that Agent Portillo had detected the smell of marijuana from the Chrysler. Agent Portillo requested that Agent Lara bring his canine Shusja to the Chrysler to conduct a canine search of the vehicle because co-Defendant Kripner initially had refused to give his consent to search the Chrysler. U.S. Border Patrol Agent Brian Ford arrived at the scene, and Agent Lara proceeded two miles south to Agent Portillo's location. Agent Ford remained with the Quaintance Defendants.

Agent Lara's canine Shusja alerted to the trunk area of the Chrysler. Agents Portillo and Lara thereafter requested that co-Defendant Kripner open the vehicle's trunk. Co-Defendant Kripner complied, and the agents found three square burlap backpacks containing marijuana. The bundles in the trunk were identical to the bundle in the backseat. An inventory inspection of the vehicle netted a fourth burlap backpack of marijuana and a handheld two-way radio with short distance capacity set to channel six.

Agent Lara advised Agent Ford via radio that marijuana had been found in the Chrysler. Agent Ford asked Defendant Mary Quaintance to exit the vehicle and handcuffed her advising her that she was being detained for possession of marijuana. Agent Ford asked Defendant Danuel Quaintance to exit the vehicle. Defendant Danuel Quaintance complied, and thereafter made certain incriminating statements not in response to interrogation. Agent Ford instructed Defendant Danuel Quaintance to put his hands behind his back and the Defendant complied.

Agent Ford secured the Defendant, read him his *Miranda* warnings, and asked him if he understood. Defendant responded in the affirmative. The Defendant again made certain incriminating statements not in response to interrogation. Agent Ford again told Defendant Danuel Quaintance that he should remain silent, but the Defendant indicated he wanted to talk.

All three Defendants were transported to the Lordsburg Border Patrol Station. Defendant Danuel Quaintance made additional incriminating statements at the station. Certain of these statements were made in response to interrogation while others were not. For example, when Defendant Danuel Quaintance was in his cell, he made certain incriminating statements through his cell door to law enforcement agents not in response to interrogation. Law enforcement agents, however, also obtained statements from Defendant Danuel Quaintance in response to interrogation. Prior to interrogating Defendant, law enforcement read him his *Miranda* rights a second time. When Defendant Danuel Quaintance asked for a lawyer, law enforcement stopped interrogating Defendant, but Defendant continued to make additional incriminating statements not in response to interrogation. The length of the interrogation was not long or protracted. There is no evidence that law enforcement used physical force or the threat of physical force. The Defendant is of an age sufficient to render a knowing and intelligent waiver of his *Miranda* rights. There is no evidence in the record that indicates the Defendant's intelligence or education would prohibit him from giving a knowing and intelligent waiver.

The four bundles of marijuana seized from the Chrysler weighed approximately 172 pounds.

The Government has charged Defendants Danuel Dean Quaintance and Mary Helen Quaintance with possession of more than 50 kilograms of marijuana with intent to distribute the

7

marijuana, and conspiracy to possess more than 50 kilograms of marijuana.  Defendant Danuel Dean Quaintance filed the motion to suppress on April 18, 2006.  Defendant Mary Helen Quaintance filed a motion to join the motion to suppress on May 2, 2006.  On May 8, 2006, the Court granted Defendant Mary Helen Quaintance's motion to join the motion to suppress.

## DISCUSSION

The Quaintance Defendants ask this Court to suppress all evidence obtained as a result of the search of both the green minivan and the Chrysler, including any statements made by Defendant Danuel Quaintance following the search, on the ground that the stop of vehicles was not based upon reasonable suspicion.[1]  The Government maintains that the stop was based upon reasonable and articulable suspicion, and, in the alternative, that even if the stop was not supported by reasonable suspicion, the inevitable discovery doctrine bars application of the exclusionary rule.  The Government further contends that certain pre-*Miranda* statements made by Defendant Danuel Quaintance should not be suppressed because they were made voluntarily and not in response to interrogation, and that certain post-*Miranda* statements made in response to interrogation should not be suppressed because Defendant Danuel Quaintance waived his *Miranda* right to remain silent.

---

[1] It is unclear whether the Quaintance Defendants seek suppression of evidence seized from both the green minivan and the Chrysler driven by co-Defendant Kripner.  To the extent the Quaintance Defendants seek suppression of the evidence seized from the Chrysler, the Government contends, and the Court agrees, that the Quaintance Defendants do not have standing to challenge the search of the Chrysler.  The Chrysler was driven by co-Defendant Kripner and neither of the Quaintance Defendants were passengers.  The Chrysler was leased to Eugene Waylon of Apache, Arizona, and individual who is allegedly co-Defendant Kripner's cousin.  The Quaintance Defendants, therefore, had no reasonable expectation of privacy in the Chrysler, and therefore do not have standing to seek suppression of evidence seized from the Chrysler.  Accordingly, to the extent the Quaintance Defendants' motion seeks suppression of evidence seized from the Chrysler, the Court denies the motion.

8

I.      <u>Legality of the Stop</u>.

"Border Patrol agents 'on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion' that those vehicles' occupants may be involved in criminal activity." *United States v. Cantu*, 87 F.3d 1118, 1121 (10th Cir. 1996) (quoting *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975)).  Reasonable suspicion does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Arvizu*, 534 U.S. 266, 274 (2002).  Rather, "reasonable suspicion represents a 'minimum level of objective justification.'" *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).

"Any number of factors may be taken into account in deciding whether there is reasonable suspicion to stop a car in the border area." *Brignoni-Ponce*, 422 U.S. at 884.  Officers may consider:

> (1) [the] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Monsisvais*, 907 F.2d 987, 990 (10th Cir. 1990).  When evaluating an officer's decision to stop a vehicle, a court may not engage in a "sort of divide-and-conquer analysis" by evaluating and rejecting each factor in isolation.  *Arvizu*, 534 U.S. at 274; *United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003).  This is because factors that by

9

themselves may be "consistent with innocent travel" may collectively amount to reasonable suspicion. *Arvizu*, 534 U.S. at 274-275 (quoting *Sokolow*, 490 U.S. at 9). Rather, "the totality of the circumstances--the whole picture--must be taken into account. Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Cortez*, 449 U.S. 411, 417-18 (1981). "In all situations the officer is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." *Brignoni-Ponce*, 422 U.S. at 885.

An evaluation of the *Brignoni-Ponce* factors indicates that seven of the eight factors weigh in favor of finding that the border patrol officers had reasonable suspicion to stop the vehicles. First, with respect to the characteristics of the area in which the vehicle was encountered, both Agents Ramirez and Portillo testified that Highway 113 is a notorious route for alien and narcotic smugglers, and the Court already has found this testimony credible. *Cf. United States v. Quintana-Garcia*, 343 F.3d 1266, 1268 (10th Cir. 2003) (crediting testimony that New Mexico Highway 26 is a known smuggling route); *United States v. Barbee*, 968 F.2d 1026, 1029 (10th Cir. 1992) (crediting officers' uncontested testimony that old New Mexico Highway 52 is a known smuggling route); *compare Monsisvais*, 907 F.2d at 992 (finding that the absence in the record of any detail as to the characteristics of the same area coupled with statements by the officer that illegal smuggling "sometimes" occurred on New Mexico Highway 85 weighed against finding reasonable suspicion). Agent Ramirez also testified that the portion of Highway 113 near mile marker seven is particularly well known as being notorious for drug and alien smuggling because the hills provide cover and the gates can be used as markers for the drop-off and pick-up of illegal aliens or narcotics. The Court also already has found this testimony credible.

10

Accordingly, the first *Brignoni-Ponce* factor weighs in the Government's favor.

The second *Brignoni-Ponce* factor likewise weighs in the Government's favor. With respect the proximity of the area to the border, Highway 113 lies relatively close, approximately fifty miles, to the United States-Mexico border. "While the Supreme Court has cautioned that 'roads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well,' proximity to the border may be considered as a factor in the reasonable suspicion calculus." *United States v. Diaz-Juarez*, 299 F.3d 1138, 1142 (9th Cir. 2002) (quoting *Brignoni-Ponce*, 422 U.S. at 882). "Obviously, the closer the stop occurs to the border, the more weight the Court can accord to this factor." *United States v. Mendez*, No. 04-2279, 2006 U.S. App. LEXIS 14845, *11 (10th Cir. June 14, 2006) (unpublished opinion). Here, the stop occurred approximately fifty miles from the border. A distance of fifty miles or less has routinely been held sufficiently close to the border to contribute to a finding of reasonable suspicion.[2] *See Quintana-Garcia*, 343 F.3d at 1272 (fifty to sixty miles from the border); *United States v. Barron-Cabrera*, 119 F.3d 1454, 1458 n.4 & 1460 (10th Cir. 1997) (forty-five miles from the border); *United States v. Lopez-Martinez*, 25 F.3d 1481, 1485 (10th Cir. 1994) (sixty miles from the border); *compare United States v. Venzor-Castillo*, 991 F.2d 634, 635, 639 (10th Cir. 1993) (agent lacked reasonable suspicion to conduct stop 235 miles from border).

The third factor, the usual patterns of traffic on the particular road, also weighs in favor of

---

[2] As the Tenth Circuit noted in *United States v. Mendez*, "'We also find it instructive, although not dispositive, that federal law permits Border Patrol agents to make warrantless stops within a reasonable distance from the border.'" No. 04-2279, 2006 U.S. App. LEXIS 14845, *11 n.3 (10th Cir. June 14, 2006) (unpublished opinion) (quoting *Quintana-Garcia*, 343 F.3d at 1272 n.6) (additional citations omitted). "Federal regulations define 'reasonable distance' as, *inter alia*, 100 miles from the border." *Id.* (citing 8 C.F.R. § 287.1(a)(2)).

11

the Government.  Agents Ramirez and Portillo testified that Highway 113 is used primarily by individuals living locally, and that the license plate on the green minivan was from Arizona and the license plate on the Chrysler was a temporary dealer plate.  *Cf. Mendez*, 2006 U.S. App. LEXIS 14845, *12-13 ("While the presence of a foreign license plate would constitute stronger support of a finding of reasonable suspicion, . . . we have also found the presence of an out-of-state license plate from a neighboring state can contribute to such a finding.") (citations omitted). Furthermore, both Agents Ramirez and Portillo found it suspicious that the two vehicles had traveled south on Highway 113 for several miles to no specific destination, only to turn around and drive north on Highway 113.  Agent Ramirez explained that the vehicles would have had no time to reach town or any other usual destination during the three to four minutes they vehicles were out of his sight.  Two non-local vehicles exiting Interstate 10 to travel south on Highway 113 only to turn around a drive north on that same highway is not consistent with usual and local traffic patterns on Highway 113.

With respect to the fourth *Brignoni-Ponce* factor, the previous experience of the agent with alien traffic, Agents Ramirez and Portillo both testified that Highway 113 is a notorious smuggling route for aliens and narcotics.  Moreover, both agents testified that they are aware of a pattern in which individuals meeting guides who smuggle aliens or narcotics across the border purchase large quantities of food for the guides' consumption on their trips back to Mexico.  In addition, Agent Portillo testified that in his experience, smugglers may use two vehicles traveling in tandem, with the first vehicle acting as the "heat" vehicle to detract attention from the second vehicle, which presumably would be carrying illegal aliens or contraband.  Agent Portillo also testified that he has seen a pattern of rental vehicles being used to transport narcotics.

Accordingly, the fourth *Brignoni-Ponce* factor weighs in the favor of the Government.

With respect to the fifth factor, information about recent illegal border crossings in the area, Agents Ramirez and Portillo both testified that Highway 113 is a notorious alien and narcotic smuggling route.  The Government, however, did not produce any evidence of specific, recent illegal border crossings in the area.  On balance, however, this factor also weighs slightly in the Government's favor.

With respect to the sixth factor, the driver's behavior, including any obvious attempts to evade officers, this factor likewise weighs in the Government's favor.  The two vehicles exited Interstate 10 and drove south down Highway 113, a highway used predominantly by locals, for several miles to no specific destination only to turn around and drive north on Highway 113.  In addition, the Defendants were driving in two vehicles in tandem, and Agent Portillo testified that this resembled cases in which smugglers use the first vehicle to act as the "heat" vehicle to detract attention from the second vehicle.  Finally, Agent Portillo also testified that as he drove his vehicle closer to the Chrysler, co-Defendant Kripner got "real nervous."  This behavior, including the possible use of a "heat" vehicle to evade officers, weighs in the Government's favor.

With respect to the seventh *Brignoni-Ponce* factor, aspects of the vehicle, such as a station wagon with concealed compartments, the Government presented evidence that the Chrysler was dusty, and that Agent Portillo observed dusty handprints on the trunk of the vehicle. This evidence does not weigh heavily in the Government's favor, but nonetheless does constitute evidence from which one could conclude that the Defendants had driven down Highway 113, which is dusty, to the area near mile marker seven to drop off or pick up contraband, which involved opening the trunk and leaving dusty handprints on the trunk.  The fact that the vehicles

13

did not have local license plates also tips the balance of this factor in the Government's favor.

The eighth, and final, *Brignoni-Ponce* factor does not weigh in the Government's favor. The Government presented no evidence at the hearing on the motion to suppress that either of the vehicles looked heavily loaded. Accordingly, this factor weighs against the seven other factors that weigh in the Government's favor.

Seven of the eight *Brignoni-Ponce* factors weigh in favor of finding that the officers had a reasonable suspicion to stop the vehicles. Although individually, dusty handprints on a truck, or the purchasing of a large amount of food, may not constitute specific articulable facts that taken together with rational inferences from those facts would reasonably warrant suspicion that the Quaintance Defendants were involved in criminal activity, *Cantu*, 87 F.3d at 1121, the Court cannot apply a "divide-and-conquer analysis, *Arvizu*, 534 U.S. at 274; *Gandara-Salinas*, 327 F.3d at 1130. All of the circumstances described above, considered together, constitute a minimum level of objective justification, *i.e.*, reasonable suspicion, for the stop. *Mendez*, 118 F.3d at 1431; *compare Arvizu*, 534 U.S. at 274 (reasonable suspicion does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard").[3] Accordingly, the Court denies the Quaintance Defendants' motion to suppress on the ground that the officers lacked reasonable suspicion to stop the green minivan.

---

[3] Because the Court finds that the stop was based upon reasonable suspicion, the Court declines to decide whether the Government's alternative argument that the exclusionary rule is inapplicable because the inevitable discovery doctrine applies.

II.     <u>Legality of the Statements</u>.

*Miranda* requires that procedural safeguards be administered to a criminal suspect prior to "custodial interrogation."  *Miranda v. Arizona*, 384 U.S. 436 (1966).  Defendant Danuel Quaintance made statements prior to and after receiving his *Miranda* warnings.  Specifically, when Agent Lara advised Agent Ford via radio that marijuana had been found in the Chrysler, Agent Ford asked Defendant Danuel Quaintance to exit the green minivan.  Defendant Danuel Quaintance complied, and thereafter made certain incriminating statements not in response to any interrogation, inquiry, or questioning by law enforcement.  Then, after Agent Ford read the Defendant his *Miranda* warnings, the Defendant again made certain incriminating statements not in response to interrogation.  Agent Ford told Defendant Danuel Quaintance that he should remain silent, but the Defendant indicated he wanted to talk.  Later, at the Lordsburg Station, the Defendant made additional statements through his cell door to law enforcement agents not in response to interrogation.  Because Defendant Danuel Quaintance's statements were made voluntarily and not in response to interrogation, *Miranda* does not apply and the statements are admissible.

Defendant Danuel Quaintance also made statements while in custody and in response to interrogation.  The Government contends that the Defendant made these statements after officers gave him his *Miranda* warnings and that the Defendant voluntarily chose to waive his *Miranda* rights.  The government bears the burden of proving a valid waiver of *Miranda* rights by a preponderance of the evidence.  *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).  The Supreme Court has held that a district court's inquiry into the validity of a waiver of *Miranda* rights has two dimensions:

> First, the relinquishment of the right must have been voluntary in
> the sense that it was the product of a free and deliberate choice
> rather than intimidation, coercion, or deception.  Second, the
> waiver must have been made with a full awareness of both the
> nature of the right being abandoned and the consequences of the
> decision to abandon it.  Only if "the totality of the circumstances
> surrounding the interrogation" reveal both an uncoerced choice and
> the requisite level of comprehension may a court properly conclude
> that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).

A determination of whether the waiver of *Miranda* rights is voluntary, knowing and intelligent thus is based on the totality of the circumstances.  Under this approach, the Court must examine "several factors including the characteristics of the suspect, such as his [or her] age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his [or her] rights, the length of the detention and the interrogation, and the use or threat of physical force."  *United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998).

There is no evidence in this record that Defendant Danuel Quaintance's statements were the result of intimidation, coercion, or deception or that the waiver was without a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Defendant Danuel Quaintance is of a reasonable age to render a voluntary, knowing, and intelligent waiver, and there is no evidence in the record to indicate that the Defendant's intelligence or education weighs against finding his waiver voluntary, knowing, and intelligent. Law enforcement officers read Defendant his *Miranda* warnings a second time at the Lordsburg station prior to interrogating him.  The length of their interrogation was not long or protracted. There is no evidence that law enforcement used physical force or the threat of physical force.  The Defendant, after receiving his *Miranda* warnings a second time, made certain incriminating

16

statements in response to interrogation.  After the Defendant made these statements, he indicated that he wanted an attorney.  At that time, although the agents asked no further questions, the Defendant continued to make incriminating statements.  The Court concludes that "the totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension.  Accordingly, the Court denies the motion to suppress to the extent it seeks suppression of Defendant Danuel Quaintance's post-*Miranda* statements in response to interrogation.

**CONCLUSION**

**WHEREFORE**, for the foregoing reasons, Defendants Danuel Dean Quaintance and Mary Helen Quaintance's Motion for Suppression of Evidence and Incorporated Memorandum, April 18, 2006 **[Doc. No. 39]** is hereby **DENIED**.

Dated this 5th day of July 2006.

JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE