## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                       Cr. No. 06-538 JCH

DANUEL DEAN QUAINTANCE,
MARY HELEN QUAINTANCE,
TIMOTHY JASON KRIPNER, and
JOSEPH ALLEN BUTTS,

        Defendants.

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Joseph Allen Butts's Motion to Suppress Physical Evidence and Statements, filed July 18, 2006 **[Doc. No. 136]**. On August 22, 2006, the Court held an evidentiary hearing on the Motion to Suppress. Defendant Joseph Allen Butts was present at the hearing and was represented by Bernadette Sedillo, Esq. The United States was present and represented by Assistant United States Attorney Luis Martinez and Special Assistant U.S. Attorney Amanda Gould. After considering the evidence presented at the hearing, along with the arguments of counsel, written briefs, and applicable law, the Court concludes that the Motion is not well taken and should be denied.

## FINDINGS OF FACT

Based upon the evidence presented at the hearing, the Court makes the following findings of fact.

On February 13, 2006, Missouri State Highway Patrol Corporal G. C. Swartz stopped a

pickup truck operated by Defendant Joseph Allen Butts approximately 45 miles west of St. Louis for the traffic violations of following too closely and running off the right side of the roadway. Defendant Butts had been traveling eastbound, towards St. Louis, on Interstate 44 at the 245 mile marker in Franklin County, Missouri. Corporal Swartz observed a subject, later determined to be Defendant Butts, following a tractor trailer too closely at a distance of approximately two car lengths. Thereafter, the subject signaled to pass the tractor trailer and as he signaled ran his vehicle off of the right side of the roadway. The subject then changed lanes into the passing lane, traveled up to the tractor portion of the tractor trailer, slowed down, and pulled back into the right lane behind the tractor trailer. Corporal Swartz activated his red lights and siren and pulled the subject over. Corporal Swartz initiated this traffic stop at 10:40 a.m.

The subject Defendant Butts pulled into the right shoulder. Corporal Swartz exited his patrol car and walked up to the passenger side of the vehicle. Corporal Swartz noticed that the vehicle had a plastic tunnel covering the truck bed. Corporal Swartz had noticed this type of cover on many occasions, and on a few occasions had seen this type of cover used to conceal marijuana.

Corporal Swartz asked Defendant Butts for his driver's license and vehicle registration and informed Butts of the reason he had stopped him. As he was handing Corporal Swartz his driver's license, Defendant Butts said that he was sorry, that he was just looking around at the scenery, and that he did not mean to do anything wrong. Corporal Swartz asked Defendant Butts to whom the vehicle belonged, and Defendant Butts indicted that it belonged to his sister-in-law. Defendant Butts appeared nervous, and his hands were shaking when he handed Corporal Swartz his driver's license and registration. Defendant Butts did not know what he was going to say

2

next, and he was just "blurting stuff off the cuff."

At that time, Corporal Swartz asked Defendant Butts if he would accompany Corporal Swartz back to his patrol car. As Corporal Swartz was asking Butts to accompany him, Swartz used a hand gesture to motion Butts back to his patrol car. Corporal Swartz began walking back to his patrol car and out of the corner of his eye saw Butts reaching into the back seat of his car. Swartz turned around to make sure Butts was exiting his vehicle and to observe whether Butts was bringing anything out of his vehicle.

The Missouri State Highway Patrol has no standard procedure regarding the manner in which officers should conduct their traffic stops. Corporal Swartz normally conducts his traffic stops by asking subjects to accompany him to his patrol car. Corporal Swartz conducts his traffic stops in this manner for a variety of reasons. First, Corporal Swartz must return to his vehicle to run computer checks on licenses and registrations, and Swartz need not exit his patrol car to discuss any issues that may arise from the checks if subjects are present in his vehicle. Second, removing subjects from their vehicles helps ensure officer safety by allowing Corporal Swartz to have control of the subjects' environment. Finally, by placing subjects in his patrol car, Corporal Swartz need not worry about traffic on the interstate. Officers have been injured while standing on the side of the road conducting traffic investigations and noise from the traffic makes it difficult to hear subjects. Corporal Swartz has allowed subjects who have refused to accompany him to his vehicle to remain in their own vehicles.

Corporal Swartz directed Defendant Butts to sit in the front seat of his patrol car. After Defendant Butts was seated, Corporal Swartz began the process of running checks to determine whether Defendant's vehicle had been reported stolen and whether there were any warrants out

for Defendant's arrest.  Corporal Swartz also contacted his troop headquarters to request a

criminal history check on Defendant Butts.

    While he was waiting for responses to these inquiries, Corporal Swartz asked Defendant

Butts where he was headed, and Defendant Butts indicated that he had moved from Arizona and

that he was traveling to St. Louis to look for work in welding.  Corporal Swartz found this

"strange" because February is mid-winter, and he did not believe outdoor welding jobs would be

available during the winter; he also believed that indoor welding jobs were reserved for union

workers.  Moreover, Corporal Swartz wondered why, if Defendant Butts was looking for work in

welding, Butts would be leaving Arizona, an area much more likely to have outdoor welding jobs

than St. Louis.  Corporal Swartz also thought it was suspicious that Defendant Butts would be

driving to an unspecified location in St. Louis for an unspecified job, particularly when Corporal

Swartz observed Yahoo- or MapQuest-type driving directions laying on the front seat of

Defendant's vehicle.  In Corporal Swartz's experience maps of this type typically provide

directions to specific destinations.[1]

    At that point, Defendant Butts changed the subject by indicating that he was not only

looking for work but that he also was collecting antiques along the way.  Corporal Swartz did not

see any antiques in Defendant Butts's truck.  In addition, Defendant Butts indicated that he was

going to take antiques back to California when he had earlier told Corporal Swartz that he had

moved from California to Arizona and that he had lost his antiques business in California because

of a divorce.  Furthermore, Butts had stated that he and his wife had owned the antiques company

---

[1] Later, after Defendant's arrest, Corporal Swartz learned that the map did not provide
directions to a specific location but rather to St. Louis generally.

for 33 years, and Swartz concluded that based upon Butts's age, Butts would have been approximately 15 years old when he first started the business.  Based upon these discrepancies, Corporal Swartz did not find Defendant Butts's story credible.

Corporal Swartz became more suspicious when Defendant Butts changed his story and informed Swartz that his sister, and not his sister-in-law, owned the vehicle he was driving.  In addition, the name on the registration of Defendant Butts's vehicle indicated that the vehicle was registered in Arizona to a male, Hispanic subject, and that the subject had registered the vehicle on or around December 21st.  When Corporal Swartz questioned Defendant about the identify of the male subject, Defendant indicated that his sister had bought the vehicle one month prior to Defendant Butts's move to Arizona.  Based upon the facts Defendant had already told him, Corporal Swartz estimated that Defendant's sister would have purchased the vehicle on or around December 13th.  Corporal Swartz found this suspicious because the vehicle was registered to someone who was not Defendant Butts's sister after Defendant's sister allegedly purchased the vehicle.  In addition, the male subject would have registered the vehicle for an additional year when he had plans to, and did in fact, sell the vehicle.

Corporal Swartz's suspicions were further raised because Defendant Butts gave conflicting reasons for his traffic violations.  Defendant Butts initially indicated that he drove off of the road because he was admiring the scenery.  Later, he blamed it on the weather by saying it was windy.  Defendant Butts also stated that he had had his cruise control set at the time the tractor trailer slowed down, and that he ran up behind the tractor trailer because the tractor trailer slowed down when the driver saw Swartz's police vehicle.  Corporal Swartz found Defendant's explanations suspicious because it is unusual for a subject to give three separate reasons for a

traffic violation.

As Defendant Butts was sitting in Corporal Swartz's patrol car, Butts became increasingly nervous. Defendant Butts had a nervous, "almost . . . forced laugh." In addition, Defendant Butts frequently changed the subject.

At no time did Corporal Swartz use his handcuffs or display his firearm. The tone of the conversation between Corporal Swartz and Defendant was pleasant and unthreatening. Although Corporal Swartz asked Defendant questions, these questions were conversational in tone. Defendant himself initiated and contributed to the conversation. At no time did Defendant indicate that he did not wish to converse with Swartz. The conversation was reciprocal and voluntary. Although Corporal Swartz's K-9 was in the rear of Swartz's vehicle, there is no evidence that Defendant was aware of the K-9's presence. In addition, Corporal Swartz's K-9 is quiet, and was quiet during the duration of the stop of Defendant, and subjects usually do not know that the K-9 is in the back of the vehicle.

After a few minutes of conversing with Defendant Butts, Corporal Swartz's troop headquarters informed him that Defendant had a criminal history but that it was not drug related. Corporal Swartz also found out that Defendant Butts' vehicle had not been reported stolen. Corporal Swartz informed Butts that he was going to give him a warning for the violations that he had observed.

At this point, based upon his experience and training, Corporal Swartz suspected that Defendant Butts was engaged in some type of criminal activity. Corporal Swartz suspected drug-related activity because of the area from which Defendant Butts was driving. Corporal Swartz asked Butts if there was anything illegal in his vehicle. Defendant Butts replied that there was

6

not.  Corporal Swartz then asked Defendant whether there was any marijuana, cocaine, or other substance of that nature in Defendant's vehicle.  Defendant Butts did not answer the question directly, but rather asked Corporal Swartz whether Butts looked like he was the type of person who would be "doing that sort of thing."  Corporal Swartz asked Defendant Butts for permission to search his vehicle.  Defendant Butts did not give Swartz permission but rather indicated that the vehicle was his sister's and that she would want Corporal Swartz searching it.  Corporal Swartz asked for Defendant Butts's consent to search the vehicle at 10:47 a.m., seven minutes after Swartz initiated the traffic stop.

When Corporal Swartz began asking about consent and drugs, Defendant Butts's demeanor changed.  He became very serious and got "rather fidgety."  At that time, Corporal Swartz informed Defendant Butts that he was contacting his troop headquarters to ask for a backup officer to be dispatched to their location so that he could conduct a K-9 sniff of Defendant Butts's vehicle.  While they were waiting for backup, Defendant Butts asked Corporal Swartz if he could go to his vehicle to retrieve some water.  Corporal Swartz told Defendant to "stay right there."  At that time, Defendant was not free to enter his vehicle.

At 10:55 a.m., backup arrived on the scene, and Corporal Swartz deployed his K-9 on Defendant Butts's vehicle.  At 11:02 a.m., the K-9 alerted to the odor of narcotics and indicated that the odor was coming from the rear of the vehicle.  By 11:04 a.m., officers had seized approximately 338 pounds of marijuana, which had been hidden in the vehicle's bed beneath the locked plastic cover.  Officers also found just over $1,500 in cash.  Corporal Swartz placed Defendant Butts under arrest, at which time Butts made a statement not responsive to any interrogation.  Specifically, Butts said, "You can't do that because it's a hate crime."  Butts then

requested that the police look in his duffel bag, in which officers found a certificate indicating that Butts had been ordained by a church as a courier for the church.  Officers also found and seized a membership card to the Church of Cognizance.

## DISCUSSION

The Fourth Amendment protects "[t]he right of the people to be secure . . . against unreasonable searches and seizures."  U.S. Const. amend. IV.  The Fourth Amendment applies to seizures of persons, including brief investigatory stops of vehicles.  *United States v. Cortez*, 449 U.S. 411, 417 (1981).  A traffic stop is a "seizure" within the meaning of the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief."  *Delaware v. Prouse*, 440 U.S. 648, 653 (1979).  Routine traffic stops are analyzed under the principles developed for investigative detentions set forth in *Terry v. Ohio*, 392 U.S. 1 (1968).  To determine the reasonableness of an investigative detention, a court must make a dual inquiry, asking first "whether the officer's action was justified at its inception," and second "whether it was reasonably related in scope to the circumstances which justified the interference in the first place."  *Terry*, 392 U.S. at 20.

The Court concludes that Corporal Swartz's initial traffic stop of Defendant was justified at its inception.  Corporal Swartz credibly testified that he observed Defendant following too closely to the tractor trailer in front of him and that Defendant's actions constituted a violation of the law.  Corporal Swartz also credibly testified that he observed Defendant cross over the line on the right side of the roadway in violation of the law.  Based upon these violations of the Missouri traffic code, Corporal Swartz activated his lights and effectuated a traffic stop of Defendant.

The Court must next determine whether Corporal Swartz's actions were reasonably

related in scope to the circumstances that justified the interference in the first place. Defense counsel argues that Corporal Swartz's detention of Defendant in his patrol unit and the "persistent questioning" of Defendant were not reasonably related in scope to the traffic stop for following too closely or driving off of the roadway. The Court disagrees. There is no standard procedure governing the manner in which officers conduct their traffic stops, and Officer Swartz normally conducts his traffic stops by asking subjects to return to his patrol car. Conducting his traffic stops in this manner allows Swartz to (1) run computer checks on a suspect's license and registration while simultaneously discussing any questions he may have with the suspect, (2) place subjects in an officer-controlled, instead of subject-controlled, environment, thereby improving officer safety, and (3) eliminate the safety- and noise-related concerns of questioning a subject while standing on the side of the roadway. The Court concludes that Corporal Swartz's actions in placing Defendant in his patrol unit were reasonably related in scope to the stop for the traffic violations.

The Court likewise concludes that Corporal Swartz's questions regarding the ownership of Defendant's vehicle, the name on the vehicle's registration, and the reason for Defendant's traffic violations were reasonably related in scope to the traffic stop. Corporal Swartz's questions regarding the location to which Defendant was driving and the reason for which he was driving to that location also were reasonably related to the scope of the initial traffic stop. An officer stopping a subject for traffic violations reasonably could pose questions regarding the origin and destination of the subject's travel. Corporal Swartz's tone was pleasant and conversational and Defendant Butts was a participant in the conversation. At no time did Butts indicate he did not wish to talk to Swartz. In addition, only seven minutes elapsed from the time of Defendant's

initial stop and the time Officer Swartz indicated that he would be issuing warnings for the traffic violations. Based upon the foregoing, the Court concludes that Swartz's actions were reasonably related in scope to the traffic stop.

The Court must next determine whether Corporal Swartz's detention of Defendant was reasonable after the stop no longer was related to the traffic violations, *i.e.*, after Corporal Swartz informed Defendant that he was issuing warnings for the traffic violations. An officer may detain a driver for reasons unrelated to an initial traffic stop if (1) the officer has "an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring or (2) if the initial stop has become a consensual encounter." *United States v. Cervine*, 347 F.3d 865, 868-69 (10th Cir. 2003). The Government concedes that the stop at issue here never became a consensual encounter. The Court therefore must determine whether Corporal Swartz had an objectively reasonable and articulable suspicion that illegal activity was occurring to justify his continued detention of Defendant.

The Government maintains that based upon the circumstances known to Corporal Swartz at the time he decided to detain Defendant Butts after the conclusions of the traffic stop, Corporal Swartz had a reasonable articulable suspicion that criminal activity was afoot. The Court agrees. First, from the outset Defendant was nervous. His hands were shaking when he handed Corporal Swartz his driver's license and registration, he did not know what he was going to say next, and he was just "blurting stuff off the cuff."

Second, Defendant Butts informed Corporal Swartz that his sister owned the vehicle when he originally had told Swartz that the vehicle was owned by his sister-in-law.

Third, the name on the registration of Defendant Butts's vehicle indicated that the vehicle

10

was registered in Arizona to a male, Hispanic subject and not to Butts's sister.  Butts's comments

to Swartz indicated that his sister had bought the vehicle around December 13th, but the vehicle

had been registered by the male subject around December 21st, more than a week after

Defendant's sister allegedly purchased the vehicle.  In addition, the male subject would have

registered the vehicle for an additional year when he likely knew that he would be selling the

vehicle.

      Fourth, Defendant Butts gave conflicting reasons for his traffic violations.  Butts initially

indicated that he drove off the road because he was admiring the scenery.  Later, he blamed it on

the weather by saying it was windy.  Butts also stated that he was following too closely to the

tractor trailer because the tractor trailer slowed down when its driver saw Swartz's patrol car.

      Fifth, Butts became increasingly nervous as he was sitting in Swartz's patrol car,

exhibiting a nervous, "almost . . . forced laugh," and changing the subject when Swartz

questioned him.

      Sixth, Defendant Butts indicated that he was traveling to St. Louis to look for work in

outdoor welding.  However, St. Louis does not have a lot of outdoor welding jobs during

February and Corporal Swartz testified that he believed indoor welding jobs are reserved for

union workers.  In contrast, Arizona, the area from which Defendant allegedly was moving,

would have significantly more outdoor welding jobs available in mid-winter.  In addition,

Defendant Butts was traveling to an unspecified location in St. Louis for an unspecified job.

      Finally, Defendant was traveling to St. Louis to look for work but also was collecting

antiques along the way.  Defendant Butts indicated that he was going to take the antiques back to

California, when he had earlier told Corporal Swartz that he was now living in Arizona and that

he had lost his business in California because of a divorce.  Based upon Butts's story, he would have been approximately fifteen years old when he had started his antiques business.

The Court concludes that based upon the totality of the circumstances a law enforcement officer in Corporal Swartz's position would have had an objectively reasonable and articulable suspicion that illegal activity was occurring.  Reasonable suspicion need "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard."  *United States v. Arvizu*, 534 U.S. 266, 274 (2002).  Rather, "reasonable suspicion represents a 'minimum level of objective justification.'"  *United States v. Mendez*, 118 F.3d 1426, 1431 (10th Cir. 1997) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)).  In determining whether reasonable suspicion exists, a court may not evaluate and reject each reasonable suspicion factor in isolation.  *United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003) (citing *Arvizu*, 534 U.S. at 274-75).  "[T]he totality of the circumstances--the whole picture--must be taken into account.  Based upon that whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."  *Cortez*, 449 U.S. at 417-18.  Here, a reasonable officer in Corporal Swartz's position would have had an objective basis for suspecting Defendant Butts of engaging in criminal activity.

At the hearing on Defendant's Motion to Suppress, defense counsel argued that Corporal Swartz's detention of Defendant in his patrol car rose to the level of a *de facto* arrest requiring probable cause rather than an investigative detention requiring reasonable suspicion.  There is no bright-line test for determining when a detention turns into a *de facto* arrest; rather, an evaluation must be guided by common sense and ordinary human experience.  *See United States v.*

12

*Melendez-Garcia*, 28 F.3d 1046, 1052 (10th Cir. 1994).  Therefore, the Court must weigh "both the character of the official intrusion [on the person's liberty] and its justification."  *Michigan v. Summers*, 452 U.S. 692, 701 (1981).  An officer need not place a person formally under arrest to effect a *de facto* arrest.  *See, e.g.*, *Melendez-Garcia*, 28 F.3d at 1052.  For example, the Tenth Circuit has held that an officer's use of handcuffs and display of firearms may transform an investigative detention into an arrest, even though the officer did not formally arrest the suspect. *Id.*  Likewise, the Tenth Circuit has held that an officer's request that a defendant accompany him to a police station exceeded the scope of an investigative detention and became a full-fledged arrest, even though the officer did not place the suspect formally under arrest.  *United States v. Gonzalez*, 763 F.2d 1127, 1132-33 (10th Cir. 1985).

The Court concludes that Corporal Swartz's detention of Defendant Butts in his patrol car did not rise to the level of a *de facto* arrest.  Corporal Swartz did not use handcuffs or a display of firearms, and he did not ask Defendant Butts to return to the police station with him.  Rather, Swartz merely requested that Defendant return to his patrol car with him.  Corporal Swartz testified that he regularly conducts his traffic stops in this fashion for a variety of reasons.  The Court already has concluded that Swartz's actions in requesting that Defendant return to his patrol car were reasonably related in scope to the traffic stop.  In addition, the Court notes that the character of Corporal Swartz's intrusion did not rise to a *de facto* arrest.  Corporal Swartz directed Defendant to sit in the front, and not the rear, seat of his patrol car, and Swartz also was seated in the front of the patrol car.  While Corporal Swartz was running checks on Butts and his vehicle, Swartz and Defendant engaged in a reciprocal and voluntary conversation, the tone of which was pleasant and unthreatening.  Defendant Butts initiated and contributed to the

13

conversation. Although Swartz's K-9 was in the rear of the patrol car, there was no evidence that Defendant was aware of the K-9's presence or that the K-9 intimidated him. Moreover, a silent K-9 in the back of a patrol car is not akin to an officer pointing a weapon at a subject. Swartz's detention of Defendant Butts was brief: seven minutes for the traffic stop and seventeen minutes after the stop.[2] The fact that Swartz would not allow Defendant to return to his vehicle to obtain some water during the course does not render this brief detention akin to an arrest. Weighing the character of the official intrusion on Defendant's liberty and Corporal Swartz's justification for that intrusion, the Court concludes that the detention did not rise to the level of a *de facto* arrest.

Because the Court has concluded that Defendant's detention was not a *de facto* arrest requiring probable cause but rather an investigative detention requiring reasonable suspicion, and because the Court has concluded that Officer Swartz did have a reasonable and articulable suspicion that criminal activity was afoot, the Court denies Defendant Butts's Motion to Suppress the marijuana seized from Defendant's truck and Defendant's post-arrest statements.

## CONCLUSION

**WHEREFORE**, for the foregoing reasons, Defendant Joseph Allen Butts's Motion to Suppress Physical Evidence and Statements, filed July 18, 2006 **[Doc. No. 136]**, is hereby **DENIED**.

Dated this 9th day of November 2006.

JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE

---

[2] Corporal Swartz initiated the traffic stop at 10:40 a.m., the traffic stop had concluded at approximately 10:47 a.m., backup had arrived at 10:55 a.m., the K-9 had alerted to the odor of narcotics at 11:02 a.m., and police had seized the marijuana by 11:04 a.m.

14