## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

v.                                        Cr. No. 06-538 JCH

DANUEL DEAN QUAINTANCE,
MARY HELEN QUAINTANCE,
TIMOTHY JASON KRIPNER, and
JOSEPH ALLEN BUTTS,

       Defendants.

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Danuel Dean Quaintance's Motion to Dismiss Indictment and Incorporated Memorandum, filed April 7, 2006, **[Doc. No. 34]** ("Motion to Dismiss").  Defendants Mary Helen Quaintance and Joseph Allen Butts join in the Motion to Dismiss.  On August 21, 2006, the Court conducted a three-day evidentiary hearing on the Motion to Dismiss.  Defendant Danuel Dean Quaintance was present at the hearing and was represented by Marc H. Robert, Esq.  Defendant Mary Helen Quaintance was present and represented by Mario A. Esparza, Esq.  Defendant Joseph Allen Butts was present and represented by Bernadette Sedillo, Esq.  The United States was present and represented by Assistant United States Attorney Luis Martinez and Special Assistant United States Attorney Amanda Gould.  After considering the evidence presented at the hearing, along with the arguments of counsel, written briefs, and applicable law, the Court concludes that the Motion to Dismiss is not well taken and should be denied.

1

## BACKGROUND

Defendants Danuel Quaintance, Mary Quaintance, and Joseph Butts are charged with possession of more than 50 kilograms of marijuana with the intent to distribute in violation of the Controlled Substances Act (CSA), 21 U.S.C. § 841, and with conspiracy to possess more than 100 kilograms with the intent to distribute in violation of the CSA, 21 U.S.C. § 846.[1]

Defendant Danuel Quaintance is the founder of the Church of Cognizance, and Defendants Mary Quaintance and Joseph Butts are members of the Church of Cognizance.  Defendants maintain that marijuana is a sacrament and deity and that the consumption of marijuana is a means of worship.  Defendants argue that the application of the CSA to members of the Church of Cognizance constitutes a substantial burden on the exercise of religion in violation of the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb *et seq.*, as well as the Establishment Clause and First Amendment to the United States Constitution.

## DISCUSSION

The Religious Freedom Restoration Act (RFRA) was passed in 1993 in response to the Supreme Court's decision in *Employment Division v. Smith*, 494 U.S. 872 (1990).  In that case, the Supreme Court abolished the compelling interest test for judicial claims involving the free exercise of religion.  RFRA re-established the strict scrutiny test for judicial claims involving the free exercise of religion.  RFRA states in relevant part:

Government shall not substantially burden a person's exercise of

_____

[1] Facts regarding Defendants Danuel and Mary Quaintance's arrest are set forth in detail in the Memorandum Opinion and Order, filed July 5, 2006 [Doc. 117], denying the Quaintance Defendants' Motion to Suppress.  Facts regarding Defendant Butts's arrest are set forth in detail in the Memorandum Opinion and Order, filed November 9, 2006 [Doc. 178], denying Defendant Butts's Motion to Suppress.  The Court does not restate those facts herein.

religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

(b) Exception.

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person –

(1)     is in furtherance of a compelling governmental interest; and

(2)     is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000bb-1(a) and (b).  Defendants maintain that the application of the CSA to the Church of Cognizance constitutes a substantial burden on the exercise of religion by members of the Church of Cognizance.  Although Defendants also argue that the application of the CSA to members of the church is not in furtherance of a compelling governmental interest and that it is not the least restrictive means of furthering that interest, the parties seek only a ruling on whether the CSA substantially burdens their religious beliefs.

A person claiming that the government has placed a substantial burden on his or her practice of religion must establish that the governmental action (1) substantially burdens (2) a religious belief, not just a philosophy or way of life, (3) which belief is sincerely held.  *United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir. 1996) (citing *Thiry v. Carlson*, 78 F.3d 1491 (10th Cir. 1996)).  That showing must be made by a preponderance of the evidence.  *Id.*

The Government concedes that application of the CSA substantially burdens the Defendants' beliefs.  Accordingly, the only questions before the Court are (1) whether Defendants' beliefs are religious, and not simply a philosophy or way of life, and (2) whether

those beliefs are sincerely held.

I.      Religious Belief.

In *United States v. Meyers*, the Tenth Circuit set forth the following five factors a district court should consider in determining whether a belief is "religious" for purposes of RFRA:  (1) ultimate ideas, (2) metaphysical beliefs, (3) moral or ethical system, (4) comprehensiveness of beliefs, and (5) accoutrements of religion.  *Id.* at 1483.  In *Meyers*, the United States charged the defendant with two offenses stemming from marijuana possession and trafficking.  906 F. Supp. at 1495.  Meyers asserted that the United States could not prosecute him for these crimes because, as a "Reverend" of the "Church of Marijuana," his possession and distribution of marijuana was legally protected religious conduct.  *Id.*  The question before the *Meyers* court was whether the "Church of Marijuana" was a bona fide religion that triggered the protections of RFRA.  *Id.*  The district court concluded that Meyers's beliefs were secular and not religious, *id.* at 1508, and the Tenth Circuit affirmed.  In so holding, the Tenth Circuit explained that Meyers's beliefs "more accurately espouse a philosophy and/or way of life rather than a 'religion.'"  95 F.3d at 1484.

In applying the *Meyers* factors, the Tenth Circuit explained that a district court "'cannot rely solely on established or recognized religions to guide it in determining whether a new and unique set of beliefs warrants inclusion.'"  *Id.* (quoting *Meyers*, 906 F. Supp. at 1503).  Moreover, the Tenth Circuit indicated that "'no one of these factors is dispositive,'" and that "the factors should be seen as criteria that, if minimally satisfied, counsel the inclusion of beliefs within the term 'religion.'"  *Id.* (quoting *Meyers*, 906 F. Supp. at 1503).  That said, the court concluded that "'purely personal, political, ideological, or secular beliefs'" would not likely "'satisfy enough criteria for inclusion.'"  *Id.* (quoting *Meyers*, 906 F. Supp. at 1504) (additional citations omitted);

*see also Wisconsin v. Yoder*, 406 U.S. 205, 216 (1972) (philosophical and personal beliefs are not religious beliefs); *Africa  v. Pennsylvania*, 662 F.2d 1025, 1036 (3d Cir. 1981) (finding beliefs are secular and not religious); *Berman v. United States*, 156 F.2d 377, 380-81 (9th Cir. 1946) (beliefs that are moral and social are not religious); *Church of the Chosen People v. United States*, 548 F. Supp. 1247, 1253 (D. Minn. 1982) (beliefs that are sexual and secular are not religious).  Whether a particular set of beliefs are "religious" within the meaning of RFRA is a legal question reviewed *de novo*.  *Meyers*, 95 F.3d at 1482.

Defendants maintain that their beliefs meet the criteria of *Meyers*.[2]  The Government disagrees.  The Court addresses each of the *Meyers* factors in turn.

A.  Application of the Meyers Factors.

1.  Ultimate Ideas.

In explaining this factor, the *Meyers* court stated, "Religious beliefs often address fundamental questions about life, purpose, and death.  As one court has put it, 'a religion addresses fundamental and ultimate questions having to do with deep and imponderable matters.'" *Id.* at 1483 (quoting *Africa*, 662 F.2d at 1032).  "These matters may include existential matters, such as man's sense of being; teleological matters, such as man's purpose in life; and cosmological matters, such as man's place in the universe." *Id.*  The district court in *Meyers* concluded that Meyers's beliefs did not deal with "ultimate concerns" such as life, purpose, and death; they did not address "a fear of the unknown, the pain of loss, a sense of alienation, feelings of

---

[2] As a threshold matter, Defendants urge the Court not to apply the *Meyers* factors. Defendants maintain that the *Meyers* factors are "inappropriate and dangerous" because they define what constitutes a "religion" through the lens of "convention" and a "mainstream religious tradition."  Defendants, however, do not provide any authority in support of their position.

purposelessness, the inexplicability of the world, and the prospects of eternity."  906 F. Supp. at

1505.  The district court "simply was unable to discern anything ultimate, profound, or

imponderable about Meyers's beliefs."  *Id.*

Defendants' beliefs likewise do not meet the "ultimate ideas" factor.[3]  In describing how

the Church of Cognizance meets this criterion, Defendant Danuel Quaintance testified that the

"purpose of life is to live a good life and help others.  You start as a seed and you grow from that

point, and you expand in knowledge and wisdom, and hopefully, on a right path, a narrow path,

to the longevity, to the longest life that you can live."  Aug. 22, 2006, Tr. at 240-41; *see also id.*

at 248 (Testimony of D. Quaintance) (The Church of Cognizance is a "truth-based religion, where

we seek longevity, we seek to live the longest, healthiest life within our means.  It's a narrow path

to that."); *id.* at 226 (Testimony of D. Quaintance) (the church teaches that the "main thing in life

is extending life and to live as long a life as possible").  Mr. Quaintance also explained that the

purpose of the church "is to try to, you know, bring people around to the right way of life. . . .

[T]here[] [are] two paths, the broad path through destruction and the narrow path through

righteousness."  *Id.* at 227.

Although the Church of Cognizance attempts to answer questions regarding the purpose

of life, the Court does not believe that these answers are sufficient to qualify as "ultimate ideas"

within the meaning of *Meyers*.  There is nothing "ultimate, profound, or imponderable," *Meyers*,

---

[3] Defendants Helen Quaintance and Joseph Allen Butts testified by proffer that their beliefs
are the same as the beliefs described by Defendant Danuel Quaintance during his testimony.
Accordingly, because Danuel Quaintance's testimony regarding his beliefs is representative of the
beliefs of Ms. Quaintance and Mr. Butts and because Ms. Quaintance and Mr. Butts set forth little
or no independent evidence, the Court conducts a single analysis of whether Defendants' beliefs
are "religious."

906 F. Supp. at 1505, about Danuel Quaintance's explanation of the Church of Cognizance's definition of the purpose of life.  Living as long a life as possible is a relatively simplistic purpose confined to the physical world.  It is not a comprehensive, profound, inexplicable, or imponderable *religious* philosophy that addresses purpose in relationship to the spiritual or intangible world.  Although Defendants express a belief about leading a "good" life on a "narrow path," this asserted belief is amorphous and does not address the more imponderable aspects of that idea, such as why Defendants should lead a good life or what constitutes a good life.

Moreover, even if Defendants' definition of the purpose of life is an "ultimate idea," the purpose life is only one of the many "ultimate ideas" that the *Meyers* court identifies.  Defendants' beliefs do not address other ultimate ideas, such as life and creation, a fear of the unknown, the pain of loss, a sense of alienation, or the inexplicability of the world.  *Cf. id.*  Defendants' beliefs also ignore existential or cosmological concerns, *cf.* 95 F.3d at 1483, such as an individual's existence, his or her place in the universe, the nature or natural order of the universe, and the origin, structure, and space-time relationships of the universe.  Furthermore, although Mr. Quaintance testified to his beliefs regarding an afterlife,[4] neither his beliefs, nor the beliefs of the other members of the Church of Cognizance, provide a uniform answer to questions regarding the prospects of eternity or an afterlife.  *Cf.* 906 F. Supp. at 1505.  Mr. Quaintance specifically testified that each member of the church is entitled to have his or her own individual beliefs

---

[4] Danuel Quaintance testified that when "[he] was younger [he] believed in a heaven and a hell," but that "today [he] seek[s] the truth in life, and [he doesn't] see that there is an afterlife." Aug. 22, 2006, Tr. at 241-42.

regarding the question of afterlife.[5]  Because Defendants' beliefs do not address the fundamental

questions answered by most religions, the Court therefore concludes that Defendants' beliefs do

not satisfy the "ultimate ideas" criterion.

2.     <u>Metaphysical Beliefs</u>.

In describing this factor, the *Meyers* court stated, "Religious beliefs often are

'metaphysical,' that is, they address a reality which transcends the physical and immediately

apparent world.  Adherents to many religions believe that there is another dimension, place, mode,

or temporality, and they often believe that these places are inhabited by spirits, souls, forces,

deities, and other sorts of inchoate or intangible entities."  *Meyers*, 95 F.3d at 1483.  In

considering this criterion, the district court in *Meyers* rejected the defendant's argument that his

beliefs were metaphysical because smoking marijuana induced an altered state of being.  The court

thoughtfully explained,

> There is nothing metaphysical about Meyers' beliefs.  Indeed,
> everything about his beliefs is physical.  He smokes the dried leaves
> of a plant, and the resulting psycho-pharmacological effects leave
> him in a state of 'peaceful awareness.'  Though the Court does not
> doubt that certain physical states of being can engender or induce
> different mental states of being, this does not mean that deliberately
> altered physical states of being are themselves 'religious.'  The
> Court also recognizes that certain religions use mind-altering
> substances, or engage in mind-altering physical activities (such as
> fasting or sitting in sweat lodges), as a means to a spiritual end.  The
> end usually is movement toward, or the perception of, a different
> reality or dimension.  Here, there is no such end.

---

[5] Danuel Quaintance testified that he does not "tell [members] or dictate to them whether
they have to believe in a heaven or a hell, or anything to that aspect."  Aug. 22, 2006, Tr. at 241-
42.  "Some members believe in [an after life]."  *Id.* at 241.  The church's "individual orthodox
members monasteries," however, "have the right to their own individual belief" with respect to
whether there is an afterlife.  *Id.*

> Meyers did not say that smoking 10 to 12 joints a day propelled him
> into a perpetual state of religious awareness, or that smoking 10 to
> 12 joints a day was a means to a religious end.  For Meyers, the end
> appears to be smoking marijuana.  Meyers never equated marijuana
> smoking with a spiritual dimension, mystical plane, or transcendent
> reality.  Although Meyers thinks that smoking marijuana has great
> therapeutic value, he did not assert that smoking marijuana lofts him
> into the realm of the religious.  Thus, there does not appear to be
> anything metaphysical about Meyers' beliefs.

906 F. Supp. at 1505.

The evidence is ambiguous whether Defendants' beliefs qualify as metaphysical.  The

district court in *Meyers* explained that there was nothing metaphysical about the fact that smoking

marijuana left the defendant in a different mental state of being or that it left him in a state of

"peaceful awareness" because such states were not in themselves religious.  *Id.*  The fact that

"cannabis has helped [Danuel and Mary Quaintance] focus before," Aug. 22, 2006, Tr. at 242, or

that marijuana makes "many people feel more alive, more aware, more in tune," Aug. 21, 2006,

Tr. at 118 (Testimony of M. Senger), likewise is not metaphysical or religious.  If marijuana use

results in expanded mental capabilities, such as increased focus or awareness, this result occurs

simply because of the physical (and not spiritual or religious) interaction between the mind-

altering substance and the user.

Defendants, however, have presented other evidence from which one could conclude that

their use of marijuana propels them into the "spiritual dimension, mystical plane, or transcendent

reality" described by the district court in *Meyers*.  906 F. Supp. at 1505.  Unlike the defendant in

*Meyers*, Defendant Danuel Quaintance testified that he believes that cannabis or haoma is in the

nature of a spiritual force that has the ability to accomplish things in the physical world.  *Id.* at

243.  Mr. Senger testified that the cannabis teaches "the agenda of the divine mind" by

9

"implanting" thoughts regarding that agenda into the minds of those who consume it.  *See, e.g.*, Aug. 21, 2006, Tr. at 119; *see also id.* at 95 (Testimony of M. Senger) (cannabis led him to an elevated spiritual sense and that it inspired him on a quest for truth).  The informational pamphlet on the Church of Cognizance states that "Marijuana . . . utilized in the proper mode, and setting, will allow the Cogniscenti to expand upon mental capabilities to a point some believe to be myths. Telekinesis is possible!"[6]  Defendants Exh. 8; *see also* Aug. 22, 2006, Tr. at 243 (Testimony of D. Quaintance) ("When I ask for a boom, . . . I quite often receive an answer.  This morning I was in the room and I got up and said haoma . . . and I seen a sign that was telling me . . . I'm going to be with you in the courtroom today."); *id.* (cannabis has helped "remove the resistance so you can build faith in what you're trying to do because faith can move mountains").

The *Meyers* court rejected the defendant's contention that his beliefs were metaphysical because smoking marijuana induced an altered state of being.  The court reasoned that Meyers' altered state was limited to a physical and not spiritual end.  *Meyers*, 906 F. Supp. at 1505 ("Meyers never equated marijuana smoking with a spiritual dimension, mystical plane, or transcendent reality.").  In contrast, Defendants have presented evidence that, although weak, indicates that they consume marijuana to reach a spiritual end.  Specifically, Defendants have testified that they believe cannabis is a "spiritual force that has the ability to accomplish things in the physical world," Aug. 22, 2006, Tr. at 243 (Testimony of D. Quaintance), and that it allows a

---

[6] Although telekinesis can be viewed as an expanded mental capability, and therefore not metaphysical within the meaning of *Meyers*, it also has been defined as "[t]he movement of objects by scientifically inexplicable means, as by the exercise of an occult power."  *American Heritage Dictionary* (4th ed. 2000).  Because the definition of telekinesis can involve an otherworldly power, the Court construes the reference to telekinesis as evidence of a metaphysical belief within the meaning of *Meyers*.

person to "act in furtherance of . . . the agenda of the divine mind . . . sort of like thought implantation," Aug. 21, 2006, Tr. at 119 (Testimony of M. Senger). The Tenth Circuit has stated, "[T]he [*Meyers*] factors should be seen as criteria that, if minimally satisfied, counsel the inclusion of beliefs within the term 'religion.'" 95 F.3d at 1484 (quoting *Meyers*, 906 F. Supp. at 1503). Although under a more stringent standard the Court would not consider Defendants' beliefs "metaphysical," under the standard articulated by the Tenth Circuit the Court concludes that Defendants minimally have satisfied the metaphysical requirement.[7]

    3.    Moral or Ethical System.

In describing this factor, the Tenth Circuit has explained, "Religious beliefs often prescribe a particular manner of acting, or way of life, that is 'moral' or 'ethical.' In other words, these beliefs often describe certain acts in normative terms, such as 'right and wrong,' 'good and evil,' or 'just and unjust.' The beliefs then proscribe those acts that are 'wrong,' 'evil,' or 'unjust.' A moral or ethical belief structure also may create duties--duties often imposed by some higher power, force, or spirit--that require the believer to abnegate elemental self-interest." *Id.* at 1483.

The district court in *Meyers* rejected Meyers's argument that his church's motto of "give a hand up, not a hand out" constitutes a moral or ethical system. Meyers explained that his church

---

[7] Defendants also have presented evidence that "karma" plays a role in their beliefs. When asked how the Church of Cognizance meets the metaphysical criterion, Danuel Quaintance testified that "if you have a lot of people thinking bad about you, you're going to get bad." Aug. 22, 2006, Tr. at 242; *see also id.* at 181. "[T]he metaphysical is the karma aspect." *Id.* at 242. Although Mr. Quaintance's belief that if "people [are] thinking bad about you, you're going to get bad" is not consistent with the definition of karma (karma is the principle according to which a person is rewarded or punished in this life or another according to *that person's* deeds and not according to the thoughts of others), the Court construes Mr. Quaintance's testimony liberally and assumes that his statement has some limited relationship to a metaphysical world, *i.e.*, a reality beyond what is perceptible to the senses.

"gives others 'a hand' by helping drug addicts and alcoholics kick their habits.  The church does

so by using marijuana as a substitute for other drugs or alcohol."  *Meyers*, 906 F. Supp. at 1505.

In rejecting this argument, the district court explained,

> Although helping others kick detrimental habits certainly is a
> laudable goal, it hardly supplies church members with the pervasive
> guidance that ethics or morals provide.  A single precept that
> encourages church members to help drug addicts or alcoholics kick
> their habits does not answer questions such a s:  How should I live
> my life?  How should I treat others?  What is forbidden?  What is
> allowed?  A single injunction to help others may itself be moral or
> ethical under the standard of most religions (or under the standard
> of secular ethics and morals), but that does not transform the
> injunction into an ethics or morality.
>
> This aside, Meyers did not discuss any beliefs or commands that
> require believers to abandon base or elemental self-interest.
> Nothing about Meyers' 'religion' restrains members from doing
> that which they should not do, or binds them to do that which they
> should do.  It is apparent, therefore, that Meyers' alleged religion
> has neither produced nor adopted an ethical code or moral system.

*Id.*

Defendants here likewise have not presented evidence sufficient to indicate that their

asserted belief in marijuana as a deity, plant, and sacrament constitutes a moral or ethical system.

Danuel Quaintance testified that his beliefs, and those of his church, meet the moral or ethical

system criterion by virtue of their belief that "having good thoughts, produc[es] good words,

produc[es] good deeds."  Aug. 22, 2006, Tr. at 243.  Mr. Quaintance also explained that his

church believes that "any action that were to create a victim . . . is an punishable offense."  *Id.* at

244.  The "good thoughts, good words, good deeds" motto, according to Danuel Quaintance,

"pretty well covers all Ten Commandments."[8]  *Id.*  When asked how the saying provides specific guidance, Mr. Quaintance explained that there is "not much more than that inside the Zoroastrian religion."[9]  *Id.*

A spiritual or ethical system is not comprised of simply one vague and unspecific motto. A simple phrase may sum up a morality, but the phrase alone cannot be the extent of the morality. The phrase must be underpinned by a more elaborate ethics.  Here, it is unclear from Defendants' motto "good thoughts, good words, good deeds" precisely what, for example, is "good."  A "moral or ethical system," as defined by *Meyers*, should provide sufficient information to determine the definition of "good," or conversely, "bad."  In one religion, it might be considered "good" to be an active participant in life, to defend order through action, and to embrace all of life's experiences through action; asceticism might be frowned upon in such a religion.  In another religion, asceticism and avoidance of the pleasures of life might be valued.  Although both religions may sum up their ethics as "good thoughts, good words, good deeds," that phrase would have significantly different meanings in each religion.  Because the extent of the moral or ethical system espoused by Defendants is "good thoughts, good words, good deeds," the Court concludes that Defendants have not demonstrated that their beliefs constitute a moral or ethical system within the meaning of *Meyers*.

---

[8] Anna Dibble testified that she finds direction from the church about how to conduct herself in the world and how to live her life morally based upon the church's good thoughts, good words, good deeds motto.  Aug. 22, 2006, Tr. at 165.  The phrase, according to Ms. Dibble, means that she should respect other people, that she should be careful in her choice of words, in her actions, and in her deeds.  And, that her words and deeds should always be "toward the good."  *Id.* at 166.

[9] Mr. Senger likewise testified that "good thoughts, good words, good deeds" is one of the "fundamental tenets of the Zoroastrian religious."  Aug. 21, 2006, Tr. at 118.

The Court also notes that although Defendants maintain that "good thoughts, good words, good deeds" constitutes a moral or ethical system, Defendants have set forth no evidence that this alleged system has a religious, as opposed to secular or philosophical, connotation. "Good thoughts, good words, good deeds" does not create duties "imposed by some higher power, force, or spirit," and those duties do not necessarily "require the believer to abnegate elemental self-interest." *Meyers*, 95 F.3d at 1483. Defendants have not, for example, presented evidence that a higher power, force, or spirit (presumably cannabis, their asserted deity) expects them to behave in a manner consistent with "good thoughts, good words, good deeds." Defendants likewise have not presented evidence that if they do not behave in a manner consistent with "good thoughts, good words, good deeds," they will face religious consequences. Defendants do not maintain, for example, that they will face a final judgment day on which a higher power will pass judgment on their thoughts, words, and deeds to determine whether their souls will pass to heaven or hell. Because "good thoughts, good words, good deeds" has no religious or spiritual significance, it does not constitute a moral or ethical system within the meaning of *Meyers*. *Cf.* 906 F. Supp. at 1505 (Meyers's beliefs not metaphysical because they are confined to the physical world and do not have spiritual or religious significance); *id.* at 1506 (Meyers's beliefs not comprehensive because they are not tied to a spiritual end).

    4.   <u>Comprehensiveness of Beliefs</u>.

The Tenth Circuit has explained, "Another hallmark of 'religious' ideas is that they are comprehensive. More often than not, such *beliefs* provide a telos, an *overreaching array of beliefs* that coalesce to provide the believer with answers to many, if not most, of the problems and concerns that confront humans. In other words, religious *beliefs* generally are not confined to

14

one question or a single teaching." *Meyers*, 95 F.3d at 1483 (emphasis added) (quoting *Africa*, 662 F.2d at 1035); *see also Meyers*, 906 F. Supp. at 1506 ('A religion is not generally confined to one question or one moral teaching; it has a broader scope.'") (quoting *Malnak v. Yogi*, 592 F.2d 209 (3d Cir. 1979)). The Tenth Circuit's definition of comprehensiveness requires multiple beliefs. *Meyers*, 95 F.3d at 1483. A single belief, therefore, by definition, is not comprehensive. *See id.*

Defendants' beliefs are monofaceted. They undisputably are centered around marijuana. *See, e.g.*, Aug. 21, 2006, Tr. at 114 (Testimony of M. Senger) ("the central tenet" of the Church of Cognizance is consuming cannabis); Aug. 22, 2006, Tr. at 241 (Testimony of D. Quaintance) (it is each individual orthodox members monastery's "belief . . . in the teacher, provider, protector" that "unite[s] [the monasteries] together"); *see generally* Defendants' Exh. 7 (purported "bible" of the Church of Cognizance, which has a singular focus on marijuana).[10] Based upon the monofaceted nature of the defendant's beliefs in *Meyers*, the district court held that the beliefs were not "comprehensive." 906 F. Supp. at 1506 ("There is nothing comprehensive about Meyers' beliefs. He worships a single plant; as he put it, the marijuana plant is 'the center of attention.' . . . Indeed, as the Court sees it, it would be difficult to conceive of a more monofaceted 'religion.'). The Court likewise concludes here that because Defendants' beliefs center solely around marijuana, those beliefs are not comprehensive within the meaning of

---

[10] By virtue of an oversight, defense counsel did not formally move to admit Defendants' Exhibit Seven at the hearing on the Motion to Dismiss. Defense counsel represented that the parties would submit a stipulation to the admission of Exhibit Seven. To date, no such stipulation has been submitted to the Court. However, because defense counsel has represented that the Government stipulates to the admission of the exhibit, and because the Government has failed to refute this representation, the Court will consider Defendants' Exhibit Seven.

*Meyers*.

In addition, the Court concludes that Defendants' beliefs are not comprehensive because they are not uniform.  Each member of the Church of Cognizance is entitled to adopt his or her own individual beliefs.  *See* Aug. 22, 2006, Tr. at 224 (Testimony of D. Quaintance) (there is no one leader instructing and telling everyone "'You do it my way'"); *id.* at 170 (Testimony of A. Dibble) ("each monastery has the right, according to the church, to worship from their [sic] own family traditions"); Aug. 21, 2006, Tr. at 112-13 (Testimony of M. Senger) ("[T]he church [does] not dictat[e] to each member . . . some exact religious rituals that are to be performed . . . at a certain time or a certain day, or even a certain frequency.  [The church] give[s] . . . quite a bit of degree of flexibility for each member monastery[] to . . . adopt within the constraints of the pledge of the Church.).  A set of beliefs cannot be comprehensive if the sole shared belief concerns marijuana.

The implication of the district court in *Meyers* that the defendant's beliefs might have been "comprehensive" if he had asserted that his use of marijuana played a more active role does not persuade the Court otherwise.  In rejecting Meyers's claim that his consumption of marijuana was comprehensive, the district court explained that marijuana played a "passive" role in Meyers's beliefs and that Meyers had not claimed that:  (1) marijuana had "spoken to him," "counsel[ed] him," "guide[d] him," or "t[aught] him"; (2) marijuana was a "a means to an end, the end being to attain a state of religious, spiritual, or revelatory awareness"; or (3) the use of marijuana resulted in a "religious epiphany, spiritual revelation, or transcendental awareness" and that the awareness led to "to enlightened percipience concerning the past, present, or the future."  906 F. Supp. at 1506.  These negative implications (suggesting that had Meyers so claimed, the court might have

16

held differently) are dicta and are not the holding of the *Meyers* district court.  Indeed, the district

court in *Meyers* specifically emphasized that its holding was narrow and limited to the facts before

the court.  *Id.* at 1509.  In addition, the district court's implication that a singular belief in

marijuana could be "comprehensive" if marijuana provides comprehensive guidance in daily life is

contrary to the definition of "comprehensiveness" adopted by the district court and the Tenth

Circuit.  *See Meyers*, 95 F.3d at 1483 (ideas are comprehensive if "*an overreaching array of*

*beliefs* . . . coalesce to provide the believer with answers to many, if not most, of the problems

and concerns that confront humans") (emphasis added); *Meyers*, 906 F. Supp. at 1502 (same).

The Court therefore is not persuaded to apply the *Meyers* district court dicta here.  It therefore is

irrelevant to the Court's inquiry of comprehensiveness whether Defendants believe marijuana is an

active teacher that speaks to them and guides them or whether marijuana is a means to a spiritual

(and not physical) end.[11]  *See, e.g.*, Aug. 21, 2006, Tr. at 119 (Testimony of M. Senger) (the deity

cannabis teaches "the agenda of the divine mind" by "implanting" thoughts regarding that agenda

into the minds of those who consume it); Aug. 22, 2006, Tr. at 243 (Testimony of D. Quaintance)

(cannabis or haoma is in the nature of a spiritual force that has the ability to accomplish things in

the physical world).  Defendants' singular belief in the power of marijuana (even if that belief

---

[11] Defendants presented evidence that, unlike the *Meyers* defendant, they do not consume marijuana to obtain a physical end.  *See, e.g.*, Aug. 22, 2006, Tr. at 175 (Testimony of D. Quaintance) ("I have never experienced what people would call a high, I guess stoned."); Aug. 21, 2006, Tr. at 94 (Testimony of M. Senger) ("I never really used [marijuana] to become intoxicated or to party or, anything like that."); *id.* at 114 (ground hemp seeds is not an intoxicating mixture); *id.* at 117 (the Church of Cognizance "wouldn't encourage people to become intoxicated" or to use marijuana in a recreational sense); *id.* at 118 ("[J]ust because when someone smokes marijuana, that's not to say that they're intoxicated.  You know, they may have a slightly altered state of consciousness, but they feel more – many people feel more alive, more aware, more in tune[.] . . .  And these are all good things if it leads to good thoughts, good words, good deeds.").

allegedly provides Defendants with a comprehensive set of answers to life's problems) is insufficient as a matter of law to constitute a "comprehensive" set of religious beliefs.[12]

     5.     <u>Accoutrements of Religion</u>.

In describing the final factor, which is comprised of ten subfactors, the Tenth Circuit has explained, "By analogy to many of the established or recognized religions, the presence of [various] external signs may indicate that a particular set of beliefs is 'religious.'" *Meyers*, 95 F.3d at 1483. To determine whether Defendants have presented evidence sufficient to meet this criterion, the Court considers each of the subfactors in turn.

     a.     <u>Founder, Prophet, or Teacher</u>.

"Many religions have been wholly founded or significantly influenced by a deity, teacher, seer, or prophet who is considered to be divine, enlightened, gifted, or blessed." *Meyers*, 95 F.3d at 1483. In evaluating this criterion, the district court in *Meyers* explained,

> Although Meyers founded the church in 1973, he does not claim
> that he alone possessed the kind of spiritual wisdom, ethereal
> knowledge, or divine insight that often leads to the founding of a

---

[12] The district court in *Meyers* also implied, by negative inference, that Meyers's belief in marijuana might be comprehensive if Meyers had shown that marijuana, although central, was "the center that held everything else together." 906 F. Supp. at 1506. This dicta likewise is not binding or persuasive, and Defendants' evidence that marijuana is "at the center of a broad array of human issues today" or that marijuana is "a provider of every substance" from clothing, to fuel, to housing, to food, *see e.g.*, Aug. 22, 2006, Tr. at 246, therefore is not relevant to the question of comprehensiveness. Even if it were relevant, the Court notes that Defendants' belief in marijuana as the provider of all substances is secular and not religious, and that it therefore does not demonstrate that Defendants have a set of comprehensive religious beliefs. *Compare* Meyers, 906 F. Supp. at 1506 (beliefs not comprehensive where marijuana used for a physical, and not spiritual, end); *Kiczenski v. Ashcroft*, No. CIV S-03-2305 MCE GGH PS, 2006 U.S. Dist. LEXIS 7007 (E.D. Cal. Feb. 24, 2006) (statement by individual asserting his use of marijuana is protected under RFRA "that no other plant can meet all the basic necessities of life, that it is central to our survival, and that it is necessary in order for him to live in the most healthy and harmonious possible way" constitutes evidence that marijuana is a way of life).

> religion.  Meyers calls himself a 'Reverend' of the church, but does not assert that he alone is fit for that role, and does not contend that he is divine, enlightened, or gifted.  The Church of Marijuana apparently has no founder or teacher similar to an Abraham, Jesus, Mohammed, Buddha, Confucius, Krishna, Smith, or Black Elk.

906 F. Supp. at 1506.

The evidence concerning this subfactor is conflicting.  Although Danuel Quaintance testified that "most of the members of the church consider" him to be the prophet and teacher, that he considers himself to be an "enlightener,"  that he has "all of [his] working life . . . been a leader of people," and that he does "a lot of counseling and give[s] people advice," Aug. 22, 2006, Tr. at 246, Mr. Quaintance also testified that he does not consider himself to be a deity, *id.* at 247, and that cannabis, or haoma, is Defendants' deity, *see, e.g.*, *id.* at 206-08.  In addition, Defendants do not maintain that Mr. Quaintance alone is fit for the role of founder or that Mr. Quaintance alone possesses the kind of spiritual wisdom, ethereal knowledge, or divine insight that often leads to the founding of a religion.  *Cf. Meyers*, 906 F. Supp. at 1506.  Indeed, the evidence indicates that almost all of the underpinnings of Defendants' beliefs are based upon ideas from other religions and upon knowledge conveyed by other people.  *See, e.g.*, Defendants' Exh. 8 (scripture of the Church of Cognizance).  Because the Tenth Circuit has instructed courts to find in favor of religion if the *Meyers* criteria are minimally satisfied, however, the Court concludes that Defendants have (minimally) satisfied this subfactor.

b.      Important Writings.

"Most religions embrace seminal, elemental, fundamental, or sacred writings.  These writings often include creeds, tenets, precepts, parables, commandments, prayers, scriptures, catechisms, chants, rites, or mantras."  *Meyers*, 95 F.3d at 1483.  In evaluating this criterion, the

19

district court in *Meyers* stated,

> Meyers testified that the church's 'bible' is Hemp, which was written by Jack Herer. . . .  Except for 4 pages of the book that discuss the historical and contemporary use of marijuana by various religions and sects, the remaining 200 and some odd pages cover the following secular topics: the history of hemp, the uses of hemp, the cash value of hemp, the legalization of hemp, the prohibition of hemp, medicinal uses of hemp, therapeutic uses of hemp, the food value of hemp, the sociology of hemp, the environment and hemp, and energy and hemp.  Hemp contains little original writing; it is filled primarily with reprints from newspapers, magazines, books, newsletters, studies, and cartoons.  These reprints, of course, are about marijuana.  The last 30 pages of Hemp contain helpful advertisements and order forms. . . .
>
> Hemp does not purport to be a sacred or seminal book containing tenets, precepts, rites, creeds, or parables.  While it is an interesting book full of information, statistics, studies, data, reprints, history, arguments, and advertising, it does not touch upon the lofty or fundamental issues associated with religious works.  Hemp bears absolutely no resemblance to recognized religious texts such as the Talmud, Bible, Gnostic Gospels, Koran, Veda, Bhagavad-Gita, or Book of Mormon. Hemp's profane concerns are so topical, political, and commercial, that it could not even be called a work of philosophy.  More importantly, Meyers did not claim that the Church of Marijuana uses or relies on Hemp in any way, and he did not claim that the book provides him with any sort of inspiration or guidance.  He simply asserted, unconvincingly, that Hemp was his 'bible.'

906 F. Supp. at 1506-07.

The evidence presented at the hearing is ambiguous as to whether the Church of Cognizance has "important writings" within the meaning of *Meyers*.  Danuel Quaintance testified that the important writings of the church are contained in a make-shift folder (admitted as Defendants' Exhibit 7), and that these writings are considered to be the church's "bible."  Aug. 22, 2006, Tr. at 247.  Danuel Quaintance testified that the Church of Cognizance's bible:

> is a work in constant progress and [it has] the neoZoroastrian Book
> of Cognizance expanding volume of wisdom, cognizance of
> wisdom.  And it starts with the basics of what persons should know
> about the religion.  There's the [Yasna], translated by [Danuel
> Quaintance], 9 through 11, because number 9 speaks basically of
> the benefits to be derived; 10 speaks of what it looks like, where
> it's found; 11 is the praises to it.  And that's the primary of the
> religion there.  But it's also, other, the Bible has good parts in it
> that, and good lessons there as well to be learned, and there's lots
> of things to be learned, and that's what [the church] saying is, it's a
> work in constant progress.  [People] shouldn't stop [their]
> knowledge and just stagnate there, [they] have to grow.

*Id.*  These writings are, according to Mr. Quaintance, the "starting." *Id.*

Certain evidence indicates that Defendants' bible is not an important writing within the meaning of *Meyers*.  First, Defendants maintain that their "scripture" is constantly evolving.  *Id.* at 247 (Testimony of D. Quaintance).  As such, it is difficult to see how any portion of the scripture could be classified as "important" in the larger sense.  In addition, like "Hemp," Defendants' bible includes many secular works.  For example, it contains a pamphlet produced by the Church of Cognizance entitled, "An Interview with Dr. Robert Melamede," discussing the purported effects of cannabis on the human body; a recipe for making haoma; an appendix of the ethnobotanic uses of hemp and common names of cannabis; excerpts from Hemp, by Jack Herer, a secular work, *see Meyers*, 906 F. Supp. at 1506-07; and, excerpts from various other works concerning the biological effects of marijuana, the human body's production of marijuana, the medicinal effects of marijuana, the nutritional value of marijuana, and the origins of marijuana.  Defendants' bible also includes a reprint of the Religious Freedom Reformation Act, as well as other federal and state laws, and the Church of Cognizance's "Natural Doctrine," which sets forth the church's position on marijuana use in relationship to the law.  These writings represent 32 pages of the Church of

21

Cognizance's scripture.

On the other hand, however, the scripture contains materials that could be viewed as religious in nature. For example, the writings (mainly writings of others, although some are original writings of the Quaintances) include an eight-page "translation" of the Yasna 9 through 11, in which the word "marijuana" is substituted for "haoma," as well as three pages of excerpts from the scriptures of other religions. In addition, the writings include a work entitled, "The Zoroastrian Priest in the Avesta," as well as 29 pages of articles discussing the historical uses of marijuana by various religions and the connection between "soma" or "haoma" in the Zoroastrian religion and cannabis. Because the Tenth Circuit has instructed district courts to find in favor of religion if any factor is minimally met, the Court concludes that Defendants have satisfied this subfactor.

c.    Gathering Places.

"Many religions designate particular structures or places as sacred, holy, or significant. These sites often serve as gathering places for believers. They include physical structures, such as churches, mosques, temples, pyramids, synagogues, or shrines; and natural places, such as springs, rivers, forests, plains, or mountains." *Meyers*, 95 F.3d at 1483. In evaluating this criterion, the district court in *Meyers* explained, "Although the Church of Marijuana apparently has a building of some sort at which members gather to smoke marijuana, Meyers did not assert that the building was in any way holy, sacred, or significant. The building in which church members gather apparently has no larger significance to them, as might a synagogue, mosque, temple, or shrine." 906 F. Supp. at 1507.

The Church of Cognizance has no official gathering place for its members. Rather, each

member's residence is considered an "individual orthodox member monastery," or IOMM.  Aug.

21, 2006, Tr. at 113 (Testimony of M. Senger).  Members of the church are allowed to worship

individually at any time and any place.  *See, e.g.*, Aug. 22, 2006 Tr., at 159 (Testimony of A.

Dibble).  Danuel Quaintance testified that the Church of Cognizance has no central place where

its members congregate on a regular basis because the church does not believe in "putting [its]

money into a fancy steeple and then lett[ing] the people go hungry in [the] area.  [The church

would] rather take care of the needs of those people."  *Id.* at 249.  Accordingly, the Court

concludes that Defendants have not met this subfactor.[13]

       d.     <u>Keepers of Knowledge</u>.

"Most religions have clergy, ministers, priests, reverends, monks, shamans, teachers, or

sages.  By virtue of their enlightenment, experience, education, or training, these people are

keepers and purveyors of religious knowledge."  *Meyers*, 95 F.3d at 1483.  In evaluating this

criterion, the district court in *Meyers* explained,

> Meyers asserts that he is a 'Reverend' of the 'Church of
> Marijuana.'  How he attained this revered position remains a
> mystery.  Meyers did not mention any special training, experience,
> or education that qualified him for this position.  Apparently, he is
> the only 'clergy' member of the church.  Because Meyers did not
> testify about any special duties he had, teachings he provided, or
> guidance he gave, the Court can only guess that (based on his
> descriptions of church 'services') it is his sacerdotal duty to obtain

---

[13] Mr. Quaintance testified that the Church of Cognizance is like the Society of Friends
from the Quaker religion.  "[A]nother member's house is just as good a meeting place as any
place else."  Aug. 22, 2006, Tr. at 249.  The Quaintances's house is "quite regularly used as a
meeting place because [he and Mary] do have a large living room"; they have "had 50 people in
there at a time."  *Id.*  This testimony, however, simply confirms the fact that no formal gathering
place exists.  Mr. Quaintance's testimony that they "are in the process of building a larger
gathering area" by stacking tires, *see id.*, likewise confirms that at present no such gathering place
exists.

marijuana, grow it, prepare it, smoke it, and share it.

906 F. Supp. at 1507.

Danuel Quaintance testified that he and the other "enlightened cogni[sce]nti" are the keepers of the knowledge of the Church of Cognizance.  Aug. 22, 2006, Tr. at 249-50.  Michael Senger testified that his title of "enlightened cogniscenti just means that I have demonstrated a certain degree of knowledge and mastery of, of the tenets of the Church of Cognizance, and that I have been found worthy to hold the title of enlightened cogniscenti."  Aug. 21, 2006, Tr. at 91.

Although Defendants maintain that their religion has keepers of knowledge, the evidence belies this assertion.  First, the evidence demonstrates that there is no uniform set of knowledge to keep.  Defendants repeatedly have testified that there is no one person in the Church of Cognizance instructing other members of the church what to believe.  *See, e.g.*, Aug. 22, 2006, Tr. at 224 (Testimony of D. Quaintance) (There is no one leader instructing and telling everyone, "'You do it my way.'").  The evidence also indicates that each IOMM passes down its own family traditions to the younger members of the family; therefore, neither the Quaintances nor Mr. Senger would be a keeper of knowledge of any one IOMM's family traditions.  *See* Defendants' Exh. 8.  The evidence further indicates that the church's scripture is a constantly-evolving work in progress.  Aug. 22, 2006, Tr. at 247 (Testimony of D. Quaintance).  What may be part of the scripture one day may not be part of the scripture on another day.  The church therefore does not have any singular body of knowledge to keep or pass down.

Second, the evidence does not indicate that Danuel Quaintance, Mary Quaintance, or Michael Senger (enlightened cogniscenti) have any special duties, that they provide any special teachings, or that they give any special guidance related to the spiritual aspects of the church.

Although Danuel Quaintance testified he does "a lot of counseling and give[s] people advice," *id.* at 246, there is no evidence that Mr. Quaintance provides any special religious or spiritual guidance to church members.  Likewise, although the evidence indicates that Mr. Senger provides church members with legal advice, Aug. 21, 2006, Tr. at 91-92 (Testimony of M. Senger), there is no evidence that he provides church members with spiritual or religious advice.  For these reasons, the Court concludes that Defendants have not met this subfactor.

e.       Ceremonies and Rituals.

"Most religions include some form of ceremony, ritual, liturgy, sacrament, or protocol.  These acts, statements, and movements are prescribed by the religion and are imbued with transcendent significance."  *Meyers*, 95 F.3d at 1483.  In evaluating this subfactor, the district court in *Meyers* explained, "The Church of Marijuana has only one ceremony or ritual:  to smoke and pass joints.  The church has no services, no prayers, no liturgy, no sacrament, and no blessings (such as baptism or marriage)."  906 F. Supp. at 1507.

The Church of Cognizance, like the Church of Marijuana, has one ceremony or ritual:  to consume the "sacrament" of cannabis.  The consumption of cannabis is not accompanied by ceremony or ritual.  The "church [does] not dictat[e] to each member . . . some exact religious rituals that are to be performed . . . at a certain time or a certain day, or even a certain frequency."  Aug. 21, 2006, Tr. at 112-13 (Testimony of M. Senger).  The church believes that its members can worship at any time they want, individually.  *Id.* at 159 (Testimony of A. Dibble).  The church is comprised of IOMMs and "each monastery has the right, according to the church, to worship from their own family traditions."  *Id.* (Testimony of A. Dibble).  Timothy Kripner testified that no ceremony or ritual was performed when he became a member of the church or when he

25

smoked marijuana with the Quaintances.  Aug. 22, 2006, at 290-91.  The church has "no services,
no prayers, no liturgy, and no blessings."  *Meyers*, 906 F. Supp. at 1507.  Because the evidence
indicates a complete absence of any ceremony or ritual, the Court concludes that Defendants have
not satisfied this subfactor.

f.    <u>Structure or Organization</u>.

"Many religions have a congregation or group of believers who are led, supervised, or
counseled by a hierarchy of teachers, clergy, sages, priests, etc."  *Meyers*, 95 F.3d at 1483.  In
evaluating this subfactor, the district court in *Meyers* noted, "The Church of Marijuana has
approximately 800 members, 20 of whom are 'teachers.'  Meyers did not explain what teachers
did.  To give Meyers the benefit of the doubt, the Court will assume (because Meyers did not
state) that as 'Reverend,' Meyers is the foremost church member, and that the teachers are
immediately below him either in terms of learning, prestige, knowledge, seniority, or authority."
906 F. Supp. at 1507.

The dominant structural aspect of the Church of Cognizance is that it is comprised of
IOMMs, which are independent entitles entitled to adopt their own beliefs.  There are
approximately 130 members of the Church of Cognizance nationwide (50 or 60 of whom reside in
Arizona).  Aug. 21, 2006, Tr. at 111-12 (Testimony of M. Senger).  There are 72 IOMMs in the
United States, one IOMM in Canada, one in Mexico, one in Germany, and one in France.  *Id.*
The members of the Church of Cognizance do not have regular contact with other members of the
church.  *Id.* at 158.

Although the Church of Cognizance has "enlightened cogniscenti," the members of the
church are not led, supervised, or counseled by these cogniscenti.  Aug. 22, 2006, Tr. at 224

26

(Testimony of D. Quaintance) (There is no one leader instructing and telling everyone, "'You do it my way.'").  Rather, each IOMM "has the right, according to the church, to worship from [its] own family traditions."  Aug. 22, 2006, Tr. at 170 (Testimony of A. Dibble); *see also* Aug. 21, 2006, Tr. at 113 (Testimony of M. Senger) (The church "give[s] . . . quite a bit of degree of flexibility for each member monastery[] to . . . adopt within the constraints of the pledge of the Church. . . .  [S]ome members of the church believe in reincarnation, others don't.  So . . . there's certainly that freedom of individual beliefs that we offer as to--we're not going to dictate that everyone has to believe in reincarnation.").  The Court concludes that based upon these facts, Defendants do not meet the structure and organization subfactor.

g.    Holidays.

"As is etymologically evident, many religions celebrate, observe, or mark 'holy,' sacred, or important days, weeks, or months."  *Meyers*, 95 F.3d at 1483.  Defendants did not set forth evidence that the Church of Cognizance has holidays.  Although Danuel Quaintance testified that the church has the "soltic cycle," which is "based upon the Egyptian calendar," Aug. 22, 2006, Tr. at 250, he explained that this is not a holiday, but rather an "honored time," *id.* at 251.  Based upon the evidence, the Court concludes that Defendants have not met this subfactor.  *Cf. Meyers*, 906 F. Supp. at 1507 (factor not met where defendant did not mention any church holidays, special days, or holy days).

h.    Diet or Fasting.

"Religions often prescribe or prohibit the eating of certain foods and the drinking of certain liquids on particular days or during particular times."  *Meyers*, 95 F.3d at 1483. Defendants did not present any evidence that the Church of Cognizance prescribes or prohibits

27

the eating of certain foods or liquids on particular days. Danuel Quaintance testified that the

church would "prefer that everybody would eat hemp seeds," and "use haoma, because that is the

ultimate diet of longevity." Aug. 22, 2006, Tr. at 245. This, however, does not constitute a

"prescribed" or "prohibited" consumption of a food or liquid. Accordingly, Defendants do not

meet this subfactor. *Cf. Meyers*, 906 F. Supp. at 1507 (factor not met where defendant did not

testify about any special diet or days of fasting that church members are required or asked to

observe).

i.     <u>Appearance and Clothing</u>.

"Some religions prescribe the manner in which believers should maintain their physical

appearance, and other religions prescribe the type of clothing that believers should wear."

*Meyers*, 95 F.3d at 1483-84. Danuel Quaintance testified that the church has "no clothing

restrictions." Aug. 22, 2006, Tr. at 245. Rather, the particular manner of dress is what is

"[a]ppropriate for the occasion."[14] *Id.* at 251. Defendants, therefore, do not meet this subfactor.

906 F. Supp. at 1507 (factor not met where defendant did not mention any beliefs concerning a

church member's appearance or clothing).

j.     <u>Propagation</u>.

"Most religious groups, thinking that they have something worthwhile or essential to offer

non-believers, attempt to propagate their views and persuade others of their correctness. This is

sometimes called 'mission work,' 'witnessing,' 'converting,' or proselytizing." *Meyers*, 95 F.3d

at 1484. Danuel Quaintance specifically testified that members of the Church of Cognizance "are

---

[14] The fact that Mr. Quaintance pointed out that the Baptist and Methodist churches do not prescribe the type of clothing a member should wear, *see* Aug. 22, 2006, Tr. at 245, does not change the fact that the Church of Cognizance does not meet this subfactor.

28

not out proselytizing."  Aug. 22, 2006, Tr. at 225.  "[P]eople, you know, they're already utilizing and stuff when they come to the church and they believe that there's another higher level that [the church] offer[s] as a religious aspect to it."  *Id.*  Although the purpose of the church's website is to "speak[] to the entire world," *id.* at 252, this fact, in light of Mr. Quaintance's specific testimony that members do not proselytize, does not constitute proselytizing within the meaning of *Meyers.*  Accordingly, Defendants do not meet this subfactor.  *Cf.* 906 F. Supp. at 1507 (factor not met where defendant testified that the Church of Marijuana does not engage in any type of mission work or witnessing in an effort to convert non-believers or non-smokers).

Defendants' beliefs meet only two of ten of the subfactors that a district court must consider in evaluating the criterion of accoutrements of religion.  Accordingly, the Court concludes that Defendants have not satisfied this requirement.

   6. Conclusion.

The Court has evaluated Defendants' beliefs within the *Meyers* framework set forth by the Tenth Circuit and has concluded that Defendants meet only one of the five factors indicative of whether a particular set of beliefs is "religious" for purposes of RFRA.[15]  The Court therefore concludes that Defendants have not met their burden of demonstrating by a preponderance of the evidence that their beliefs are "religious" within the meaning of RFRA.  Accordingly, the Court denies the Motion to Dismiss the Indictment.

---

[15] Even if the Court had applied the *Meyers* district court's broader definition of comprehensiveness, *see* 906 F. Supp. at 1506, and found that Defendants beliefs were comprehensive, Defendants still would have (minimally) satisfied only two of the five *Meyers* factors.  The Court therefore still would have concluded that Defendants failed to meet their burden of demonstrating by a preponderance of the evidence that their beliefs are "religious" for purposes of RFRA.

B.     Other Considerations.

Although the Court denies the Motion to Dismiss the Indictment because Defendants'
beliefs do not satisfy sufficient criteria to render them "religious" within the meaning of *Meyers*,
the Court also notes that Defendants' beliefs are more aptly characterized as secular and therefore
not entitled to statutory protection.  *Cf. Meyers*, 95 F.3d at 1484 ("'purely personal, political,
ideological, or secular beliefs'" would not likely "'satisfy enough criteria for inclusion'") (quoting
*Meyers*, 906 F. Supp. at 1504) (additional citations omitted).  At the evidentiary hearing on the
Motion to Dismiss, Defendants presented a multitude of evidence indicating that they believe
marijuana is a provider of all things needed by human beings, including food, clothing, fuel, and
shelter.[16]  Defendants also presented evidence regarding their belief in marijuana's medicinal and
therapeutic effects,[17] and their belief that marijuana will extend their lives, Defendants' Exh. 4, at
1 (Aff. of M. Senger); Defendants' Exh. 5 (Aff. of A. Dibble).  Defendants further presented
evidence that marijuana helps them "focus" and heightens their "awareness," Aug. 22, 2006, Tr.
at 242 (Testimony of D. Quaintance); Aug. 21, 2006, Tr. at 118 (Testimony of M. Senger), and
that marijuana encourages individuals to act in a socially desirable manner.  *See, e.g.*, *id.* at 94

---

[16] *See, e.g.*,  Aug. 22, 2006, Tr. at 246 (marijuana is "a provider of every substance . . .
needed by mankind . . . from clothing, to fuel, [to] housing.  [O]ne acre of [marijuana] would . . .
feed ten members of [a] family," would create "fiber to make . . . clothes . . . for years to come,"
and would create materials for "building a house.").

[17] *See, e.g.*, Defendants' Exh. 4, at 2 (Affidavit of M. Senger) ("I have come to know
Haoma to possess . . . the ability to avert symptoms of disease"); Defendants' Exh. 5, at 2 (Aff. of
A. Dibble) (same); *see also* Aug. 21, 2006, Tr. at 119 (cannabis is a healer because "there's
sufficient evidence to show that it is a virtual panacea for virtually  any disease that afflicts
mankind.  It literally is. . . .  [I]f it's cancer, heart disease, diabetes, . . . multiple sclerosis, . . . it
balances the systems, and it just seems to correct whatever imbalances that you have within your
physical body.  It knows what to do and where to go to correct those imbalances.").

(Testimony of M. Senger) ("I felt that the general effect [of marijuana] on most people . . . was to enlighten people. I mean it made people think about very . . . significant, important issues about themselves, the planet, . . . where we're all going as a humanity. And . . . it just stimulates those thought patterns. And people, you know, decided to save the forest, and save whales, and . . . save the planet, . . . based upon revelations that they received."). Beliefs regarding marijuana's uses and marijuana's medical, physical, and social effects are secular and not religious.[18] *Cf. Meyers*, 906 F. Supp. at 1508 (concluding that the "Church of Marijuana" was not a religion and stating that Meyers's beliefs are secular and not religious); *supra* § I.A.1; *id.* at I.A.2; *id.* at I.A.5.b. To the minimal extent any of Defendants' beliefs are "religious," these beliefs appear to be derived entirely out of their secular beliefs. *See infra* § II.A (describing the transformation of Defendants' beliefs from secular to religious). As the district court in *Meyers* aptly noted, "Meyers' secular and religious beliefs overlap only in the sense that Meyers holds secular beliefs which he believes in so deeply that he has transformed them into a 'religion.'" 906 F. Supp. at 1508. Defendants' beliefs, like Meyers's beliefs, have an "'ad hoc quality'" that "'neatly justify his desire to smoke marijuana.'" *Meyers*, 95 F.3d at 1484 (quoting *Meyers*, 906 F. Supp. at 1509); *see infra* § II.A.

II.     <u>Sincerely Held</u>.

        Although the Court denies Defendants' motion to dismiss the indictment based upon Defendants' failure to demonstrate that their beliefs are "religious," the Court also denies the

---

[18] The Court also notes that the fact that the Church of Cognizance excludes minors from participating in the sacrament of marijuana (unlike other religions which allow minors to consume sacramental wine), further indicates that Defendants' beliefs are a lifestyle choice and not a religion.

motion on a second, independent ground.  A person claiming that the government has placed a substantial burden on his or her practice of religion must establish the existence of a religious belief which is sincerely held.  *See, e.g.*, *Meyers*, 95 F.3d at 1482.  Sincerity is a factual matter, and a district court's findings shall not be overturned unless clearly erroneous.  *Id.*  The Court concludes that even if it had found Defendants' beliefs "religious," it would not find those beliefs sincerely held.

      A.      <u>Ad Hoc Beliefs</u>.

The evidence indicates that Defendants adopted their "religious" belief in cannabis as a sacrament and deity in order to justify their lifestyle choice to use marijuana.[19]  Mr. Quaintance testified, for example, that he initially used marijuana recreationally, to increase his "focus" and "creativity," and to better "see things," Aug. 22, 2006, Tr. at 176, 172-73, and later medicinally, to treat his chronic pancreatitis, *id.* at 172, 177.  Mr. Quaintance concedes that his earlier beliefs regarding the therapeutic and medicinal benefits of marijuana were philosophical, and not religious, in nature.  *Id.* at 175.  It was only years later that Mr. Quaintance made the ad hoc decision to refer to the physical effects of marijuana as "religious" experiences.  *See id.* Specifically, Mr. Quaintance testified that he later came to believe that marijuana enhanced his focus, creativity, and awareness because marijuana is a "teacher" or "converter," a concept that Mr. Quaintance maintains is religious in nature.  *Id.* at 175-76.  Mr. Quaintance also testified that

---

[19] The Court has no doubt that Defendants were aware of the possible protections they could obtain by citing the First Amendment or RFRA.  *Cf. Meyers*, 906 F. Supp. at 1509 (questioning the sincerity of the defendant, who the court "suspect[ed was] . . . astute enough to know that by calling his beliefs 'religious,' the First Amendment or RFRA might immunize him from prosecution").  Defendants' purported "bible" contains a copy of RFRA, state and federal constitutional laws, and the Natural Doctrine of the Church of Cognizance, which sets forth Defendants' alleged rights regarding marijuana in relationship to the law.  *See* Defendants' Exh. 7.

he thereafter came to believe that the medicinal effects of marijuana were religious in nature. *Id.* at 186.

The evidence further indicates that Defendants created their "religion" to justify their civil and social belief that marijuana produces no victim and should be legalized. When Danuel Quaintance was arrested in 1984 for his self-professed non-religious use of cannabis, Aug. 22, 2006, Tr. at 177, Mr. Quaintance justified his behavior at that time by stating that his use of marijuana produced no victim, *id.* at 178 ("I was injuring no persons . . . and nothing was coming out of me that was injurious to any other persons."), and that it was his right to use marijuana for non-religious reasons even though that use was against the civil law, *id.* ("I was an adult" and using marijuana "was within my right"; "it's a plant that, within my liberty of conscience, it was my conscience was dictating what I would do within my own body, . . . what's going into me"). Then, years later, Mr. Quaintance conveniently founded a "religion" that affirms his right to use the same substance for "religious" purposes that Mr. Quaintance believed he was entitled to use for non-religious purposes in 1984, and that espouses a core belief that the proper use of marijuana promotes good thoughts, good words, good deeds, "none of which is harmful to the health, safety, welfare, or morals of society in general," Defendants' Exh. 8.

Defendants had great incentive to redefine their secular beliefs as "religious." When Danuel Quaintance was arrested "for cannabis" and placed on six months of probation, he testified that he informed his probation officer that if the officer was going to make Quaintance take regular urinalysis tests, "[the officer] might as well just put [Quaintance] back in jail for the period because [Quaintance] was an adult and it was [his] intention to stay with what [he] felt was within [his] right. [Quaintance] was harming nobody." Aug. 22, 2006, Tr. at 178. Defendants clearly

were committed to their marijuana use, and they intended to continue that use at all costs, even incarceration. The Court has no doubt that if Mr. Quaintance was willing to go to jail to protect his admittedly non-religious use of marijuana, he willingly would recast his secular beliefs as "religious" beliefs to ensure his continued ability to use marijuana.

        B.      <u>Quantity of Marijuana</u>.

        The quantity of the marijuana found in Defendants' possession also supports the Court's finding of insincerity. On the day of the Quaintances's arrest, officers seized 77 kilograms of marijuana, Aug. 23, 2006, Tr. at 344, and on the day of Mr. Butts's arrest, officers seized 152 kilograms of marijuana. *Id.* at 345. Two hundred and twenty-nine kilograms of marijuana is equivalent to 229,000 marijuana cigarettes. *Id.* This quantity of marijuana suggests that Defendants possessed marijuana for commercial, as opposed to religious, purposes.[20]

        The fact that Mr. Quaintance testified that 20 to 25 pounds, or between 9 and 11 kilograms, of marijuana per year is necessary to sustain a single church member, Aug. 22, 2006, Tr. at 232, does not persuade the Court otherwise. Nothing in Defendants' "religion" requires them to obtain a quantity of marijuana sufficient to supply 22 church members with marijuana for one year. *Cf. United States v. Bauer*, 84 F.3d 1549, 1559 (9th Cir. 2000) (RFRA did not protect defendants because nothing in Rastafarianism required defendants to possess quantities of marijuana sufficient for distribution). Defendants presented no evidence that their beliefs require

---

[20] The possession of small amounts of marijuana for personal use might indicate possession for a sincere religious purpose. *Compare United States v. Bauer*, 84 F.3d 1549, 1559 (9th Cir. 2000) (finding that RFRA was "relevant" to counts of simple possession of marijuana, but that the statute did not apply to protect defendants from counts relating to conspiracy to distribute, possession with intent to distribute, and money laundering because "nothing before [the court] suggests that Rastafarianism would require this conduct").

them to provide a significant number of church members with a yearly supply of marijuana, or that

they did in fact regularly supply a significant number of church members with a yearly supply of

marijuana.  Although Defendants made vague references to a "wellness clinic," the Court does not

find this testimony credible.

      C.     <u>Evidence of Commerce</u>.

Evidence of Defendants' commercial involvement with marijuana further supports the

Court's finding of insincerity.  Mr. Kripner, the Quaintances's long-time drug dealer,[21] testified

that the Quaintances hired him to pick up three loads of marijuana and to deliver two of those

loads to California and the third load to Arizona.  The Quaintances told Mr. Kripner that the

persons in California to whom he delivered the first load of marijuana would stash $100,000 of

cash in his car.  *Id.* at 292.  The Quaintances agreed to pay Mr. Kripner $35,000 for delivering the

three loads.  *Id.* at 294.  The Quaintances explained that they needed $100,000 in cash to bail

Mary Quaintance's brother, Defendant Joseph Allen Butts, out of jail.  *Id.* at 286-87.

The Court finds Defendant Kripner's testimony credible, and notes that the Quaintances

had a motive (*i.e.*, bail money for Mr. Butts) to undertake a large drug transaction for monetary,

as opposed to religious, purposes.  Mr. Kripner's testimony indicates that Defendants were

engaged in the business of selling marijuana for profit and that they were not simply purchasing

marijuana for their own religious needs or the religious needs of other members of the church.

The fact that on several occasions the Quaintances told Mr. Kripner that they had trouble "getting

rid of" "bad" marijuana that Mr. Kripner had sold them, and that their inability to do so hurt their

---

    [21] Mr. Kripner regularly sold marijuana to the Quaintances (once every two weeks) for
approximately one and one-half to two years.

business," Aug. 22, 2006, Tr. at 278, further buttresses the Court's conclusion that Defendants were engaged in commerce and not a sincere religious practice.

      D.      <u>Lack of Ceremony or Ritual</u>.

      Mr. Kripner's testimony regarding the timing and manner in which the Quaintances made him a member of the Church of Cognizance also supports the Court's finding of insincerity. Mr. Kripner testified that on February 21, 2006, the day before he was scheduled to pick up the first load of marijuana, the Quaintances provided him with the church's membership pledge to sign. *Id.* at 290; Defendants' Exh. 8. The Quaintances did not require Mr. Kripner to read the pledge before signing it, *id.* at 295-96, and the Quaintances did not perform any ceremony to celebrate Mr. Kripner's new membership,[22] Aug. 22, 2006, Tr. at 290-91. The same day, the Quaintances also provided Mr. Kripner with a certificate designating Mr. Kripner as a "certified courier" of the Church of Cognizance. *See* Government's Exh. 3. Defendants presented no evidence indicating that the Quaintances questioned Mr. Kripner about his beliefs regarding the Church of Cognizance prior to (or even after) the time he became a member of the church. At no point during the process of becoming a member or receiving the courier certificate did Mr. Kripner believe that marijuana was his sacrament or deity. Aug. 22, 2006, Tr. at 294. The timing of Mr. Kripner's membership and the lack of ceremony accompanying his membership indicate that the Quaintances were acting for the sake of convenience, *i.e.*, because they believed the church would cloak Mr. Kripner with the protection of the law, and not because they had a sincere religious

---

[22] The Court also notes that Kripner smoked marijuana with the Quaintances without any ceremony or ritual. *Id.* at 291.

belief that marijuana is a sacrament and deity.[23]

      E.     <u>Other Illegal Substance</u>.

      The Court's finding of insincerity further is supported by Mr. Kripner's testimony that he sold cocaine to the Quaintances on a monthly basis and that he consumed cocaine with Mary Quaintance. *Id.* at 281-82. The fact that the Quaintances have purchased and used cocaine recreationally undermines Defendants' assertion that they consume marijuana for religious, as opposed to secular, purposes.

      F.     <u>Defendants' Sincerity</u>.

      Based upon the foregoing evidence, the Court concludes that Defendants do not sincerely hold a belief that marijuana is a sacrament and deity. Defendants cannot avoid prosecution for illegal conduct simply by transforming their lifestyle choices into a "religion." As one court aptly noted, "Those who seek the constitutional protections for their participation in an establishment of religion and freedom to practice its beliefs must not be permitted the special freedoms this sanctuary may provide merely by adopting religious nomenclature and cynically using it as a shield to protect them when participating in antisocial conduct that otherwise stands condemned." *United States v. Kuch*, 288 F. Supp. 439, 445 (D.D.C. 1968). Because Defendants have not met their burden of establishing the existence of a sincerely held religious belief, the Court denies Defendants' Motion to Dismiss the Indictment.

---

[23] The fact that Mr. Kripner testified that the Quaintances sincerely believe that marijuana is the "tree of life," Aug. 22, 2006, Tr. at 283, does not persuade the Court otherwise. Defendants presented no evidence that the "tree of life" has a spiritual or religious meaning. The Court assumes that Defendants meant that marijuana is the provider of "every substance needed by mankind," from food, to "clothing, to fuel, [to] housing." Aug. 22, 2006, Tr. at 246. The Court already has concluded that this concept has a secular, and not religious, meaning. *See supra* note 12.

## <u>CONCLUSION</u>

**WHEREFORE**, for the foregoing reasons, Defendant Danuel Dean Quaintance's Motion to Dismiss Indictment and Incorporated Memorandum, filed April 7, 2006, **[Doc. No. 34]**, is hereby **DENIED**.


Dated this 22nd day of December 2006.


JUDITH C. HERRERA
UNITED STATES DISTRICT JUDGE